# IN THE SUPREME COURT OF IOWA

No. 09–0982

Filed July 8, 2011

**STATE OF IOWA,**

Plaintiff,

vs.

**IOWA DISTRICT COURT FOR WEBSTER COUNTY,**

Defendant,

--------------------------------------------------------------------

**ROBERT HARKINS,**

Plaintiff,

vs.

**IOWA DISTRICT COURT FOR WEBSTER COUNTY,**

Defendant.

---

Certiorari to the Iowa District Court for Webster County, Kurt L. Wilke, Judge.

Robert Harkins and the State of Iowa separately challenge a district court order reinstating, in part, a convicted sex offender's earned-time credits after finding a violation of the Fifth Amendment right against self-incrimination. **STATE'S WRIT SUSTAINED; HARKINS'S WRIT ANNULLED; CASE REMANDED.**

Thomas J. Miller, Attorney General, and Jennifer M. York, Assistant Attorney General, for the State of Iowa.

Robert Harkins, Mount Pleasant, pro se.

**MANSFIELD, Justice**.

The Fifth Amendment to the United States Constitution provides, "No person . . . shall be compelled in any criminal case to be a witness against himself." According to section 903A.2(1)(*a*) (2007) of the Iowa Code, an incarcerated sex offender is not eligible for an earned-time reduction of sentence unless that person completes a sex offender treatment program. The question presented here is whether section 903A.2(1)(*a*) violates the Fifth Amendment rights of a convicted sex offender, when successful completion of the treatment program would require him to acknowledge responsibility for his offense.

We conclude there is no Fifth Amendment violation. For the reasons discussed herein, we believe the State of Iowa may use earned-time credits as an incentive for convicted sex offenders to obtain sex offender treatment, even when the treatment requires an acknowledgment of responsibility.

**I. Background Facts and Proceedings.**

On March 21, 2006, Robert Harkins was convicted of third-degree sexual abuse following a jury trial. The court of appeals, in upholding Harkins's conviction on direct appeal, summarized the relevant facts as follows:

> On August 27, 2005, Robert Harkins went out drinking with some friends. The group ended up at the home of [the victim]. After a short period of time most of the group left, except for Derrick, Trisha, Harkins, and [the victim]. Derrick, who was [the victim's] former boyfriend, passed out on the couch. Trisha went to sleep in one of the bedrooms. Harkins laid down in [the victim's] bedroom in all of his clothes. [The victim] stated she believed Harkins was sleeping or passed out, so she laid down to sleep on the other side of the bed.
>
> [The victim] testified Harkins rolled over on top of her, and she told him to get off. Harkins pinned [the victim] down and pulled her clothing off. [The victim] testified she repeatedly told Harkins no, stating, "I told him no. I told

him to stop." Harkins proceeded to engage in sexual intercourse with her. When Harkins stopped she kneed him and pushed him off, then screamed at him that she had said no. Trisha heard [the victim] say, "No, I said no." Trisha went to investigate, and met [the victim] coming out of her bedroom, clad only in a blanket and crying hysterically. Trisha stated she saw blood on [the victim's] bed. Harkins then left the home.

Trisha and [the victim] called the police, and deputy sheriff Kevin Knoche responded to the call. Deputy Knoche also saw blood on [the victim's] bed. Deputy Knoche found Harkins sleeping at the home of a friend. Harkins was not wearing his underwear, but it was stuck in the fly of his pants. Harkins denied having sex with [the victim] and stated he could not recall anything like that occurring.

[The victim] was taken to a hospital for a physical examination. [The victim] had three tears, which were bleeding, in the area of the perineum. Nancy Downing, a registered nurse, testified she did not usually find tears that were that large or bleeding at the time of the exam. Downing testified [the victim's] injuries were consistent with forced sexual intercourse.

Harkins was charged with third-degree sexual abuse, in violation of Iowa Code section 709.4 (2005). At the trial Harkins testified he remembered everything about the evening in question. He stated he and [the victim] had engaged in consensual sex. He stated that in the middle of having sex, he found out [the victim] had recently had sex with Derrick, and he made a derogatory comment to her. He stated [the victim] got mad and threw him out.

A jury found Harkins guilty of third-degree sexual abuse. Harkins was sentenced to a term of imprisonment not to exceed ten years.

*State v. Harkins*, No. 06–0660, 2007 WL 914032 (Iowa Ct. App. Mar. 28, 2007).

After the court of appeals affirmed Harkins's conviction, the district court imposed a special life sentence on Harkins pursuant to Iowa Code section 903B.1 (Supp. 2005), in addition to the original ten-year term of imprisonment. Harkins appealed the special sentence, asserting it was unconstitutional and that his counsel was ineffective for failing to object to it. On July 22, 2009, the court of appeals rejected these arguments

and again affirmed the district court. *State v. Harkins*, 786 N.W.2d 498, 502 (Iowa Ct. App. 2009).

Having been unsuccessful on his direct appeals, Harkins filed an application for postconviction relief. There he alleged four different bases for ineffective assistance, including an allegation that his counsel should have advised him not to testify at trial. The application was denied by the district court, and that denial was affirmed by the court of appeals on January 22, 2010. *Harkins v. State*, No. 08–2048, 2010 WL 200408 (Iowa Ct. App. Jan. 22, 2010).

Meanwhile, Harkins was incarcerated in the Mount Pleasant Correctional Facility. During 2007 and the first part of 2008, Harkins remained on the waiting list for the institution's sex offender treatment program (SOTP). On or about July 2, 2008, an opening in the SOTP became available. Harkins alleges, and the State does not dispute, that before he could participate in the program, Harkins had to sign a "Treatment Contract," in which he "agree[d] to be completely honest and assume full responsibility for [his] offenses and [his] behavior." Harkins refused to sign the contract and to participate in the SOTP. In response, on July 9, 2008, the Iowa Department of Corrections (IDOC) suspended Harkins's earned time pursuant to Iowa Code section 903A.2(1)(*a*) (2007).

Section 903A.2(1)(*a*) states an inmate under the control of IDOC serving a category "A" sentence[1] is eligible for earned-time credit "equal to one and two-tenths days for each day the inmate demonstrates good conduct and satisfactorily participates in any program . . . identified by the director [of the department of corrections]." In addition to this general statement, the statute also provides that "an inmate required to

---

[1]Harkins is serving a category "A" sentence because he is not subject to a mandatory minimum under Iowa Code section 902.12. *See* Iowa Code § 903A.2(1)(*a*).

participate in a sex offender treatment program shall not be eligible for a reduction of sentence unless the inmate participates in and completes a sex offender treatment program established by the director." Iowa Code § 903A.2(1)(*a*).

Following the suspension of his earned time, Harkins filed the application for postconviction relief at issue in this appeal. Harkins argued, essentially, that the suspension of his earned-time credits for failure to participate in the SOTP violated his Fifth Amendment privilege against self-incrimination. In particular, Harkins alleged:

> I have maintained innocen[c]e since day one. I had my appeal and am now going through postconviction relief with my case. I cannot enter treatment because this would be an admission of guilt and would perjur[e] myself in changing my story. Also it would hinder any chance at a new trial if I would sign a confession.

The district court granted Harkins's application in part and denied it in part. The district court determined that by conditioning Harkins's earned time upon his participation in the SOTP, in which Harkins would be required to acknowledge his criminal conduct, the State was unconstitutionally compelling Harkins to give testimony. However, the district court found the testimony would be potentially incriminating only until March 21, 2009, i.e., the last day on which the State could prosecute Harkins for perjury based upon his 2006 trial testimony. *See* Iowa Code § 802.3 (three-year statute of limitations). Accordingly, the district court ordered Harkins's earned time to be reinstated from July 9, 2008 through March 21, 2009, but suspended as of March 22, 2009, until he participated in and completed the SOTP.

Both Harkins and the State filed petitions for a writ of certiorari. Harkins argued the district court should not have suspended his accrual of earned time as of March 22, 2009. The State, in turn, argued the

district court should have upheld its original decision to suspend Harkins's earned time as of July 9, 2008, the date when he refused to enter the treatment program. We granted the two petitions and consolidated the proceedings.

**II. Standard of Review.**

We normally review certiorari actions for correction of errors at law. Iowa R. Civ. P. 6.907; *Johnson v. Iowa Dist. Ct.*, 756 N.W.2d 845, 847 (Iowa 2008). However, we have recognized a general exception to this standard of review when a certiorari action is brought alleging a violation of a constitutional right. *State v. Cullison*, 227 N.W.2d 121, 126 (Iowa 1975). In these circumstances, we make an independent evaluation of the totality of the circumstances under which the challenged ruling on the constitutional right was made. *Id.* That is, when a constitutional issue is presented, the evidence relevant to that issue is reviewed de novo. *Lewis v. Iowa Dist. Ct.*, 555 N.W.2d 216, 218 (Iowa 1996).

**III. Discussion and Analysis.**

**A. General Framework of Fifth Amendment Analysis.** The Fifth Amendment, whose text we have quoted above, applies to the State of Iowa through the Due Process Clause of the Fourteenth Amendment to the United States Constitution.[2] *State v. Walls*, 761 N.W.2d 683, 685

---

[2]Although the Iowa Constitution does not contain an equivalent provision against self-incrimination, we have held such a right to be implicit in the "due process of law" guaranteed by Article I, section 9. *State v. Height*, 117 Iowa 650, 659, 91 N.W. 935, 938 (1902). In this case, though, neither Harkins, the State, nor the district court mentioned the Iowa Constitution. *See State v. Griffin*, 691 N.W.2d 734, 736 (Iowa 2005) (finding a state constitutional claim was not preserved when the Federal Constitution was the sole ground raised in the district court); *State v. Wilkins*, 687 N.W.2d 263, 265 (Iowa 2004) (same).

Harkins's original application for postconviction relief did not cite legal authority but simply alleged self-incrimination. An unreported hearing was held, at which Harkins apparently cited to *Johnson v. Fabian*, 735 N.W.2d 295 (Minn. 2007), a

(Iowa 2009) (citing *Malloy v. Hogan*, 378 U.S. 1, 6, 84 S. Ct. 1489, 1492, 12 L. Ed. 2d 653, 658 (1964)). The Fifth Amendment's guarantees extend to Harkins despite his conviction and imprisonment. *Minnesota v. Murphy*, 465 U.S. 420, 426, 104 S. Ct. 1136, 1141, 79 L. Ed. 2d 409, 418 (1984).

In order for a party to show a violation of the privilege against self-incrimination, that party must show that he or she is being *compelled* to give *testimony* that presents an impermissible risk of *incriminating* him or her. *See Hiibel v. Sixth Judicial Dist.*, 542 U.S. 177, 189, 124 S. Ct. 2451, 2460, 159 L. Ed. 2d 292, 305 (2004) ("To qualify for the Fifth Amendment privilege, a communication must be testimonial, incriminating, and compelled.").

As a general rule, compulsion is present when the state threatens to inflict "potent sanctions" unless the constitutional privilege is waived or threatens to impose "substantial penalties" because a person elects to exercise that privilege. *Lefkowitz v. Cunningham*, 431 U.S. 801, 805, 97 S. Ct. 2132, 2135–36, 53 L. Ed. 2d 1, 7 (1977).

Thus, in a series of decisions, the U.S. Supreme Court has held that states may not penalize an individual by taking away his or her

---

decision based on the Fifth Amendment. The district court then issued a ruling that addressed only the Fifth Amendment right against self-incrimination. Neither party sought to enlarge that ruling by raising the Iowa Constitution. *See* Iowa R. Civ. P. 1.904(2); *State v. Mitchell*, 757 N.W.2d 431, 435 (Iowa 2008) (holding that when a defendant argues a constitutional violation, but the district court fails to address it, it is incumbent upon the defendant to "file a motion to enlarge the trial court's findings or in any other manner have the district court address th[e] issue").

In its brief to us, the State maintains that "[n]o state claims have been raised, and the only issue raised is one of federal Fifth Amendment law." Harkins has not disputed this point; to the contrary, in his pro se appellate brief he cited to the Fifth Amendment four separate times. For all these reasons, we confine our analysis to the U.S. Constitution. *See State v. Palmer*, 791 N.W.2d 840, 844 (Iowa 2010) (limiting a self-incrimination analysis to the Federal Constitution when no challenges under the Iowa Constitution were raised in the district court or on appeal).

government employment, professional license, or certain other rights and privileges in direct response to the individual's assertion of Fifth Amendment rights. *See id.* at 807, 97 S. Ct. at 2136, 53 L. Ed. 2d at 8 (loss of the right to participate in political associations and hold public office); *Lefkowitz v. Turley*, 414 U.S. 70, 82, 94 S. Ct. 316, 324–25, 38 L. Ed. 2d 274, 284 (1973) (ineligibility to receive government contracts); *Uniformed Sanitation Men Ass'n, Inc. v. Comm'r of Sanitation*, 392 U.S. 280, 284, 88 S. Ct. 1917, 1920, 20 L. Ed. 2d 1089, 1092 (1968) (loss of employment); *Spevack v. Klein*, 385 U.S. 511, 516, 87 S. Ct. 625, 628, 17 L. Ed. 2d 574, 578 (1967) (revocation of a professional license). In each instance, the government's threatened penalty jeopardized the individual's current livelihood or professional status, and the penalty was specifically tied to the exercise of Fifth Amendment rights.

This case is somewhat different. Harkins is not a free man, but is presently serving a ten-year term of imprisonment. The question concerns his eligibility for earned-time credits that might reduce that sentence. Also, the suspension of credits is not a direct result of Harkins's invocation of his privilege against self-incrimination, but rather his refusal to participate in a SOTP where the SOTP requires assumption of responsibility. No one disputes that the SOTP was established for bona fide rehabilitative purposes, or that requiring the offender to acknowledge responsibility for his offense serves one of those purposes. Another U.S. Supreme Court decision provides guidance here.

**B.** ***McKune v. Lile.*** In *McKune v. Lile*, 536 U.S. 24, 122 S. Ct. 2017, 153 L. Ed. 2d 47 (2002), the U.S. Supreme Court addressed Fifth Amendment rights in the context of a prison rehabilitation program for convicted sex offenders. In that case, the Court found the Kansas Department of Corrections (KDOC) did not violate the constitutional

rights of Lile, a convicted sex offender, when it threatened to curtail Lile's prison privileges unless he participated in rehabilitative treatment that required him to disclose his past sex offenses. The privileges at stake included visitation rights, earnings, work opportunities, ability to send money to family, canteen expenditures, and access to a personal television. *McKune*, 536 U.S. at 30–31, 122 S. Ct. at 2023, 153 L. Ed. 2d at 55 (plurality opinion). In addition, because Lile refused to undergo the treatment, he was going to be transferred to a maximum-security unit where his movement would be more limited, he would have four as opposed to two cellmates, and he would be in a potentially more dangerous environment. *Id.* The Court held that depriving Lile of these various privileges because of his refusal to participate in the treatment would not violate Lile's Fifth Amendment right against self-incrimination. *Id.* at 47–48, 122 S. Ct. at 2032, 153 L. Ed. 2d at 66; *id.* at 54, 122 S. Ct. at 2035, 153 L. Ed. 2d at 70 (O'Connor, J., concurring). The Court also recognized the possibility that Kansas could grant use immunity for statements made in the course of treatment as a way of avoiding potential Fifth Amendment problems, but found this was not constitutionally required. *Id.* at 34–35, 122 S. Ct. at 2025, 153 L. Ed. 2d at 57–58 (plurality opinion).

*McKune* did not produce a majority opinion. Justice Kennedy wrote for four of the justices in the majority, Justice Stevens spoke for four dissenting justices, and Justice O'Connor, writing separately from the other eight justices, concurred in the judgment upholding the actions of the KDOC.

Justice Kennedy's plurality opinion initially noted the benefits of sex offender treatment. There is a high rate of recidivism among untreated sex offenders and a broad range of agreement among

therapists and correctional officers that clinical rehabilitation programs "can enable sex offenders to manage their impulses and in this way reduce recidivism." *Id.* at 32–33, 122 S. Ct. at 2024, 153 L. Ed. 2d at 56–57. He further pointed out:

> An important component of those rehabilitation programs requires participants to confront their past and accept responsibility for their misconduct. . . . Research indicates that offenders who deny all allegations of sexual abuse are three times more likely to fail in treatment than those who admit even partial complicity.

*Id.* at 33, 122 S. Ct. at 2024, 153 L. Ed. 2d at 57 (citations omitted). Thus, Justice Kennedy described the offender's "acceptance of responsibility for past offenses" as "[t]he critical first step." *Id.* at 33, 122 S. Ct. at 2025, 153 L. Ed. 2d at 57.

Justice Kennedy also observed that, while the Fifth Amendment applies to everyone, "the fact of a valid conviction and the ensuing restrictions on liberty are essential to the Fifth Amendment analysis." *Id.* at 36, 122 S. Ct. at 2026, 153 L. Ed. 2d at 59. He added, "[R]ehabilitation is a legitimate penological interest that must be weighed against the exercise of an inmate's liberty." *Id.*

After setting out these basic parameters, Justice Kennedy concluded that the Kansas program, as administered by Kansas prison officials, did not amount to "unconstitutional compulsion." As he explained:

> A prison clinical rehabilitation program, which is acknowledged to bear a rational relation to a legitimate penological objective, does not violate the privilege against self-incrimination if the adverse consequences an inmate faces for not participating are related to the program objectives and do not constitute atypical and significant hardships in relation to the ordinary incidents of prison life.

*Id.* at 37–38, 122 S. Ct. at 2027, 153 L. Ed. 2d at 60. Justice Kennedy also noted that Lile's decision not to participate did not "affect his

eligibility for good-time credits or parole." *Id.* at 38, 122 S. Ct. at 2027, 153 L. Ed. 2d at 60. In this part of his opinion, Justice Kennedy borrowed from earlier language in *Sandin v. Conner*, 515 U.S. 472, 484, 115 S. Ct. 2293, 2300, 132 L. Ed. 2d 418, 430 (1995), which held that challenged prison conditions cannot give rise to a *due process* violation unless they impose "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."

Yet Justice Kennedy also declined to treat the compulsion inquiry as simply a comparison between the individual's conditions after he or she invoked Fifth Amendment rights and a preexisting "baseline." *McKune*, 536 U.S. at 45–47, 122 S. Ct. at 2031–32, 153 L. Ed. 2d at 65. Such an approach was unsatisfactory, because compulsion involved "a question of judgment." *Id.* at 41, 122 S. Ct. at 2028, 153 L. Ed. 2d at 62. Often, the criminal process presents defendants with "choices" that do not give rise to a Fifth Amendment claim. *Id.* at 41, 122 S. Ct. at 2029, 153 L. Ed. 2d at 62.

Justice Kennedy pointed to several instances within the criminal justice system where the government has been allowed to impose quite serious consequences on defendants who stand on their Fifth Amendment rights. *Id.* at 42–43, 122 S. Ct. at 2029–30, 153 L. Ed. 2d at 63 (citing *Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 118 S. Ct. 1244, 140 L. Ed. 2d 387 (1998) (allowing death row inmate's silence at a clemency hearing to be used against him); *Minnesota v. Murphy*, 465 U.S. 420, 104 S. Ct. 1136, 79 L. Ed. 2d 409 (1984) (no constitutional violation in requiring defendant to be truthful with the probation officer in all matters as a condition of probation); *Baxter v. Palmigiano*, 425 U.S. 308, 96 S. Ct. 1551, 47 L. Ed. 2d 810 (1976) (permitting punitive segregation and downgrade of prison classification status based on silence at a

prison disciplinary hearing)). As Justice Kennedy put it, "The parties in *Woodard*, *Murphy*, and *Baxter* all were faced with ramifications far worse than respondent faces here, and in each of those cases the Court determined that their hard choice between silence and the consequences was not compelled." *Id.* at 44–45, 122 S. Ct. at 2030, 153 L. Ed. 2d at 64. Also, in the federal criminal system, defendants typically receive a downward adjustment in their sentence for pleading guilty, and conversely suffer a longer sentence if they do not plead guilty, but this feature is "accepted" and not regarded as a violation of the defendant's Fifth Amendment rights. *Id.* at 47, 122 S. Ct. at 2032, 153 L. Ed. 2d at 65–66.

In the concluding paragraphs of his opinion, Justice Kennedy returned to his initial themes and summarized as follows:

> Acceptance of responsibility is the beginning of rehabilitation. And a recognition that there are rewards for those who attempt to reform is a vital and necessary step toward completion. The Court of Appeals' ruling would defeat these objectives. . . .
>
> The Kansas SATP [Sexual Abuse Treatment Program] represents a sensible approach to reducing the serious danger that repeat sex offenders pose to many innocent persons, most often children. The State's interest in rehabilitation is undeniable. There is, furthermore, no indication that the SATP is merely an elaborate ruse to skirt the protections of the privilege against compelled self-incrimination. Rather, the program allows prison administrators to provide to those who need treatment the incentive to seek it.

*Id.* at 47–48, 122 S. Ct. at 2032, 153 L. Ed. 2d at 66.

In short, for the plurality represented by Justice Kennedy's opinion, the loss of various prison privileges clearly did not amount to compulsion because such deprivations were not "atypical and significant hardships in relation to the ordinary incidents of prison life." *Id.* at 38; 122 S. Ct. at 2027, 153 L. Ed. 2d at 60. But the plurality also indicated

that degree of hardship was not the ultimate question, and they did not define the outer limits of what prison officials could do to encourage participation in a sex offender treatment program. Taken as a whole, the plurality opinion approves the state's use of incentives—even "hard choice[s]," *id.* at 45, 122 S. Ct. at 2030, 153 L. Ed. 2d at 64—to obtain participation in sex offender treatment programs requiring acceptance of responsibility.

Justice Stevens, writing for four dissenting justices, strenuously disagreed with the plurality's view that Lile's threatened loss of privileges did not amount to unconstitutional compulsion. He acknowledged that the SATP "clearly serves legitimate therapeutic purposes." *Id.* at 68, 122 S. Ct. at 2043, 153 L. Ed. 2d at 79 (Stevens, J., dissenting). As he put it, "Mental health professionals seem to agree that accepting responsibility for past sexual misconduct is often essential to successful treatment, and that treatment programs can reduce the risk of recidivism by sex offenders." *Id.* Yet he concluded that Kansas could not "punish an inmate's assertion of his Fifth Amendment privilege with the same mandatory sanction that follows a disciplinary conviction for an offense such as theft, sodomy, riot, arson, or assault." *Id.* at 54, 122 S. Ct. at 2035–36, 153 L. Ed. 2d at 70.

Justice Stevens pointed out that Lile's shift to a maximum-security unit and his loss of visitation and the ability to earn up to minimum wage in the present case amounted to "a serious loss of tangible privileges." *Id.* at 63–64, 122 S. Ct. at 2040–41, 153 L. Ed. 2d at 76. He added, "[T]he sanctions are in fact severe, but even if that were not so, the plurality's policy judgment does not justify the evisceration of a constitutional right." *Id.* at 54, 122 S. Ct. at 2036, 153 L. Ed. 2d at 70–71. Justice Stevens also disagreed with the proposition that the prior

criminal justice cases like *Woodard* and *Baxter* were relevant because they had upheld the imposition of sanctions on prisoners who asserted Fifth Amendment rights. In his view, there was an important distinction between the mandatory, official sanction present in Lile's case and "a mere risk of adverse consequences stemming from a voluntary choice" in cases like *Woodard*, *Murphy*, and *Baxter*. *Id.* at 59–62, 122 S. Ct. at 2038–40, 153 L. Ed. 2d at 73–75. In *Woodard*, for example, the inmate's invocation of Fifth Amendment rights in the clemency proceeding *could* be held against him, but adverse consequences were not "automatic." *Id.* at 59–60, 122 S. Ct. at 2038–39, 153 L. Ed. 2d at 74. Justice Stevens also stated that Kansas could achieve its objectives without impinging on the Fifth Amendment privilege by granting use immunity to participants. *Id.* at 69–70, 122 S. Ct. at 2043–44, 153 L. Ed. 2d at 80.

Justice O'Connor took a third approach. In the first part of her concurrence, she expressed the view that the penalties Lile faced were not "sufficiently serious to compel his testimony." *Id.* at 52, 122 S. Ct. at 2034, 153 L. Ed. 2d at 69 (O'Connor, J., concurring). This was a sufficient basis for her to uphold the actions of the KDOC and concur in the result. Nonetheless, she went on to criticize the plurality for suggesting that more serious consequences such as "longer incarceration and execution" could not constitute unconstitutional compulsion. *Id.*

Yet Justice O'Connor also criticized the dissent for its inability to draw a reasoned distinction between the "criminal justice" cases such as *Woodard*, *Murphy*, and *Baxter*—which upheld *more severe* sanctions than those imposed on Lile (e.g., loss of life in *Woodard*)—and the "penalty" cases such as *Cunningham*, *Turley*, *Uniformed Sanitation Men*, and *Spevack*. *Id.* at 52, 122 S. Ct. at 2035, 153 L. Ed. 2d at 69. She agreed with the plurality that the inmates in *Woodard*, *Murphy*, and *Baxter*, as a

practical matter, faced more onerous penalties; the dissenters' attempt to distinguish those cases on the ground that the penalties there were not "automatic" did not persuade her. *Id.*

In Justice O'Connor's view, the critical issue for Fifth Amendment purposes was not necessarily the actual penalty or sanction, but the context within which it was imposed. She elaborated:

> I believe the proper theory [of the Fifth Amendment privilege against self-incrimination] should recognize that it is generally acceptable to impose the risk of punishment, however great, so long as the actual imposition of such punishment is accomplished through a fair criminal process. . . . Forcing defendants to accept such consequences seems to me very different from imposing penalties for the refusal to incriminate oneself that go beyond the criminal process and appear, starkly, as government attempts to compel testimony; in the latter context, any penalty that is capable of compelling a person to be a witness against himself is illegitimate.

*Id.* at 53, 122 S. Ct. at 2035, 153 L. Ed. 2d at 69–70.

Under the narrowest grounds doctrine, the holding of a fragmented Supreme Court decision with no majority opinion " 'may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.' " *Marks v. United States*, 430 U.S. 188, 193, 97 S. Ct. 990, 993, 51 L. Ed. 2d 260, 266 (1977) (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15, 96 S. Ct. 2909, 2923, n.15, 49 L. Ed. 2d 859, 872 n.15 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)). Justice O'Connor's concurrence therefore controls here.

As we read Justice O'Connor's concurrence, "compulsion" is not a simple, straightforward continuum based on the severity of the sanction. Rather, under a "proper theory," the critical questions are whether the sanction was "accomplished through a fair criminal process" and whether the state was engaged in a "stark[]" attempt to compel testimony. *McKune,* 536 U.S. at 53, 122 S. Ct. at 2035, 153 L. Ed. 2d at

69 (O'Connor, J., concurring). Justice O'Connor thus appears to allow for the possibility that individuals who have been convicted through a "fair criminal process" can suffer significant adverse consequences, including a potentially longer period of incarceration, for choosing not to acknowledge their offense, provided the state was not engaged in a direct effort to compel testimony. *See also id.* at 53, 122 S. Ct. at 2035, 153 L. Ed. 2d at 70 (Justice O'Connor noting that the federal sentencing guidelines offer the potential benefit of a lower sentence in exchange for the defendant's acceptance of responsibility).

In this regard, Justice O'Connor's concurrence shares considerable ground with Justice Kennedy's plurality opinion. Both opinions, in the end, do not regard compulsion as a simple "How serious is the consequence?" inquiry. Rather, both of them recognize that a fair criminal process may impose difficult choices on defendants to serve a valid penological goal, without crossing the line into unconstitutional compulsion.

**C. Post-*McKune* Decisions of Federal Appellate Courts.** In the wake of *McKune*, a number of federal appellate courts have had to decide whether it violates the Fifth Amendment when a sex offender receives *more prison time*, rather than just *stricter prison conditions*, because he or she refused to participate in a treatment program that required him or her to admit past sex crimes. For the most part, based on their understanding of the scope of *McKune*, they have rejected these Fifth Amendment claims.

In *Searcy v. Simmons*, 299 F.3d 1220 (10th Cir. 2002), a case that had been held by the appellate court pending *McKune*, the Tenth Circuit concluded a Kansas sex offender's loss of the ability to earn good-time credits because he refused to accept responsibility for his crime and

disclose other possible sex crimes did not violate the Fifth Amendment. The court acknowledged that this specific situation was not expressly covered by *McKune.* *Searcy*, 299 F.3d at 1225. Nonetheless, applying Justice O'Connor's concurrence as the dispositive opinion, the court found that Searcy had been convicted in a "fair criminal process," and "[w]hile the potential for incrimination is not disputed, there is no assertion that the KDOC is using the SATP as a surreptitious means to obtain evidence for criminal prosecutions." *Id.* at 1226–27. As the court explained:

> Mr. Searcy's lost privileges and lost opportunity to earn future good time credits are quite simply not the result of his refusal to incriminate himself, but are a consequence of his inability to complete rehabilitation the KDOC has determined—in light of the serious offense for which Mr. Searcy was convicted—is in the best interest for Mr. Searcy and society.

*Id.* at 1227.

*Ainsworth v. Stanley*, 317 F.3d 1 (1st Cir. 2002), decided on remand after *McKune,* reached a similar outcome. There the First Circuit held New Hampshire could constitutionally deny parole in most instances to sex offenders who refused to accept responsibility for their crimes. That court commented that "Justice O'Connor does not purport to lay out any abstract analysis or unifying theory that would prefigure her views regarding the constitutionality of New Hampshire's program," and therefore "we have no clear guideposts." *Ainsworth*, 317 F.3d at 4. Hence, the First Circuit deferred to its previously expressed view that under recent decisions of the U.S. Supreme Court, the compulsion analysis "is more circumscribed in the prison context" and only "unreasonable" burdens are proscribed. *Id.* at 5. Reiterating its pre-*McKune* approach, the First Circuit concluded that New Hampshire could

subject sex offenders who refused to participate in treatment that required acceptance of responsibility to the likelihood of a longer period of incarceration, because the overall burden was not unreasonable in light of the relevant circumstances, including "the voluntary nature of the program" (i.e., participation is a choice) and the state's "valid" interest in effective rehabilitation. *Id.* at 5–6.

Although the First Circuit purported to be following its own earlier precedents rather than Justice O'Connor's concurrence, one can argue that its analytical approach is not that different from hers. The "factors" mentioned in its opinion, i.e., that the defendant was presented with a choice within a fair criminal process and that the state's purpose was not testimonial, surface also in Justice O'Connor's discussion of "proper theory" of the Fifth Amendment. *McKune*, 536 U.S. at 53, 122 S. Ct. at 2035, 153 L. Ed. 2d at 69 (O'Connor, J., concurring).

A few years later, in *Entzi v. Redmann*, 485 F.3d 998 (8th Cir. 2007), the Eighth Circuit denied a sex offender's claim that North Dakota violated his Fifth Amendment rights by withholding sentence-reduction credits when he refused to report to a sex offender education class where he would have had to admit his offense. Relying expressly on *Searcy* and Justice O'Connor's concurrence in *McKune*, the court found that the loss of an opportunity for a discretionary sentence-reduction credit "is not among the consequences for noncompliance that go 'beyond the criminal process and appear, starkly, as government attempts to compel testimony.'" *Entzi*, 485 F.3d at 1004 (quoting *McKune*, 536 U.S. at 53, 122 S. Ct. at 2035, 153 L. Ed. 2d at 69 (O'Connor, J., concurring)). This court found, therefore, no unconstitutional compulsion. *Id.*

Likewise, in *DeFoy v. McCullough*, 301 F. App'x 177 (3rd Cir. 2008), the Third Circuit upheld Pennsylvania's denial of reparole to a sex

offender based in part on the offender's refusal to participate in a treatment program. The treatment program would have required the inmate to admit his guilt even though he had obtained a new trial on the underlying charges. *DeFoy*, 301 F.App'x at 178. Applying Justice O'Connor's concurrence, the court reasoned that no unconstitutional compulsion had occurred. DeFoy's sentence was not extended; he "merely had to serve the rest of his sentence, imposed through a fair criminal process." *Id.* Furthermore, "DeFoy was not denied reparole because he invoked the Fifth Amendment, but rather, primarily because he chose not to participate in treatment." *Id.* at 182. Thus, the considerations noted by Justice O'Connor in her concurrence—i.e., the sanction merely forced the prisoner to serve out a sentence imposed in a fair criminal process, the prisoner was given a choice, and the purpose of the program was truly rehabilitative rather than to obtain testimony, *see McKune*, 536 U.S. at 53, 122 S. Ct. at 2035, 153 L. Ed. 2d at 69 (O'Connor, J., concurring)—were dispositive in overruling the Fifth Amendment claim.[3] *DeFoy*, 301 F.App'x at 182.

---

[3]At least one of these federal appellate decisions, i.e., *Searcy*, involved an automatic loss of eligibility for sentence-reduction credits, similar to Iowa Code section 903A.2(1)(*a*). Under the program at issue in *Searcy*, failure to participate in the treatment program meant that the inmate forfeited eligibility for sentence-reduction credits, but (as in Iowa) participation did not guarantee a reduction in sentence. *Searcy*, 299 F.3d at 1223 (noting that an inmate who refuses to participate in a sex offender treatment program "loses the opportunity to earn any further good time credits" and "those credits . . . cannot be regained"); s*ee also Ainsworth*, 317 F.3d at 3 (noting that "nonparticipation in the [sex offenders program] almost always results in an inmate being denied parole"); *DeFoy*, 301 F. App'x at 179 (noting that "it was the rare case that parole was granted without treatment"). As we point out above, Justice O'Connor's concurrence rejects the notion urged by Justice Stevens in dissent that it makes a constitutional difference whether "the negative outcome" follows directly from "the decision to remain silent," *McKune*, 536 U.S. at 52, 122 S. Ct. at 2035, 153 L. Ed. 2d at 69 (O'Connor, J., concurring), or whether the decision simply makes that outcome more likely.

The Ninth Circuit reached a different result in *United States v. Antelope*, 395 F.3d 1128 (9th Cir. 2005), but the facts there were somewhat different. The defendant had pled guilty to possession of child pornography and was required to participate in a treatment program as a condition of obtaining supervised release. *Antelope*, 395 F.3d at 1131. The defendant had no Fifth Amendment objection to admitting the crime of which he had been convicted, but objected to having to disclose *other* potential criminal conduct in the course of the program. *Id.* Although the court found a violation of the defendant's right against self-incrimination, its overall interpretation of O'Connor's concurrence does not appear to vary from that of the other circuits. To the contrary, the Ninth Circuit found that under her concurrence,

> the compulsion inquiry does not dispositively turn on the status of the person claiming the Fifth Amendment privilege or on the severity of the penalty imposed, although these factors may bear on the analysis. Instead, the controlling issue is the state's purpose in imposing the penalty: Although it may be acceptable for the state to impose harsh penalties on defendants when it has legitimate reasons for doing so consistent with their conviction for their crimes of incarceration, it is a different thing to impose "penalties for the refusal to incriminate oneself that go beyond the criminal process and appear, starkly, as government attempts to compel testimony."

*Id.* at 1137 (quoting *McKune*, 536 U.S. at 53, 122 S. Ct. at 2035, 153 L. Ed. 2d at 69 (O'Connor, J., concurring)). A crucial point for the Ninth Circuit was that the federal government was sanctioning "Antelope for his self-protective silence about conduct that might constitute *other* crimes." *Id.* These kinds of disclosures, the Ninth Circuit felt, were "starkly incriminating" regardless of their potential rehabilitative purpose. *Id.* at 1138.

**D. Post-*McKune* Decisions of State Appellate Courts.** In addition to these five federal appellate courts, several state appellate

courts have addressed whether a Fifth Amendment violation occurs when a convicted sex offender's release date is adversely affected because the offender refused to participate in a treatment program that required admission of responsibility. The results have been more divided. Some courts have found no Fifth Amendment violation. *See, e.g., People v. Lehmkuhl,* 117 P.3d 98, 108 (Colo. Ct. App. 2004); *Spencer v. State,* 334 S.W.3d 559, 568 (Mo. Ct. App. 2010); *Dzul v. State,* 56 P.3d 875, 884–85 (Nev. 2002); *Wilson v. Pa. Bd. of Prob. & Parole,* 942 A.2d 270, 273 (Pa. Commw. Ct. 2008); *State v. Pritchett,* 69 P.3d 1278, 1286–87 (Utah 2003). Others have. *See, e.g., James v. State,* 75 P.3d 1065, 1068 (Alaska Ct. App. 2003) (state conceded compulsion); *Bender v. N.J. Dep't of Corr.,* 812 A.2d 1154, 1160–61 (N.J. Super. Ct. App. Div. 2003); *State ex rel. Tate v. Schwarz,* 654 N.W.2d 438, 442–45 (Wis. 2002).

In *Johnson v. Fabian,* 735 N.W.2d 295 (Minn. 2007), cited by the district court below, the Minnesota Supreme Court held that convicted sex offenders could not have their sentences extended beyond their presumptive terms based on their refusal to participate in sex offender treatment programs that would have required them to admit their crimes.

*Johnson* involved two consolidated appeals of defendants who had been convicted of criminal sexual conduct. Each received an "executed sentence," which under Minnesota's sentencing scheme typically equated to a term of actual imprisonment of two-thirds that amount. 735 N.W.2d at 299. The term of actual imprisonment was subject to extension if the defendant committed a disciplinary offense while incarcerated. *Id.* When the defendants refused to participate in Minnesota's sex offender treatment program, those refusals were considered disciplinary violations, and their terms of actual imprisonment were extended by

forty-five days. *Id.* at 298. The defendants challenged these extensions as violating their Fifth Amendment rights.

In assessing the defendants' Fifth Amendment claims, the *Johnson* court agreed that *McKune* was the relevant precedent. But it declined to follow the "comments about sanctions that extend the term of incarceration" in both the plurality opinion and Justice O'Connor's opinion on the grounds they were dicta. *Id.* at 304. Instead, the *Johnson* court ultimately concluded that under both opinions, "atypical and significant hardship" was the relevant benchmark. *Id.* at 304–05. That is, if the sanction amounted to such a hardship, it was "compulsion"; if not, it was not. *Id.* As the Minnesota court put it:

> [I]t is clear to us that a majority composed of the plurality and Justice O'Connor (and likely the dissenting Justices as well) agreed in *McKune* that consequences that impose atypical and significant hardship in prison constitute compulsion for purposes of the Fifth Amendment.

*Id.* at 306. The court then went on to hold that forty-five days of additional incarceration met the "atypical and significant hardship" test and therefore constituted unconstitutional compulsion. *Id.* at 306–09.

Two dissenting justices in *Johnson* disagreed with their colleagues' reading of *McKune.* They maintained that neither the plurality nor Justice O'Connor had endorsed "atypical and significant hardship" as the standard for whether compulsion was present. *Id.* at 313. At most, the presence of such a hardship was a necessary but not sufficient condition for finding compulsion. *Id.* Discerning "no clear guideposts" in *McKune,* the dissenters argued that Minnesota should continue to follow its pre-*McKune* precedent that extending an inmate's supervised release date due to his failure to participate in a sex offender program was not "compulsion" in violation of the Fifth Amendment. *Id.* at 312–14 (citing

*State ex rel. Morrow v. LaFleur*, 590 N.W.2d 787, 789 (Minn. 1999)).  The dissent elaborated:

> Numerous federal circuit courts have considered this issue and held that extension of a supervised release date for failure to participate in treatment is not compulsion.  While the majority cites cases that have held differently, I find that the Supreme Court has not spoken clearly on this issue, nor is there a national consensus that would compel us to overturn *Morrow.*  I would hold that extending an inmate's supervised release date because of his failure to participate in a sex offender treatment program does not rise to the level of compulsion necessary to violate the inmate's Fifth Amendment privilege against self-incrimination.

*Id.* at 315 (citations omitted).

We have some difficulty squaring the *Johnson* majority's interpretation of *McKune* with our own.  While neither Justice Kennedy nor Justice O'Connor in *McKune* precisely delineated the permissible outer limits of "compulsion" in the prison context, neither indicated that imposing an "atypical and significant hardship" would automatically cross those limits.  To the contrary, both opinions noted that in prior cases, like *Woodard,* states had been allowed to impose far more serious consequences, such as a potential loss of clemency, on inmates who chose to exercise their Fifth Amendment rights.  Thus, both opinions found that the question of compulsion had to be analyzed in context, with particular emphasis (according to Justice O'Connor) on whether the consequence arose as a choice afforded by a fair criminal process and whether the underlying purpose was rehabilitative rather than the compulsion of testimony.  In our view, the respective decisions of the Tenth, Eighth, and Third Circuits in *Searcy, Entzi,* and *DeFoy* more accurately reflect this approach.

**E. Applying *McKune* to This Case.**  Based on our reading of *McKune,* we find no Fifth Amendment violation here.  The requirement

that Harkins participate in the SOTP to be eligible for earned-time credits was part of "a fair criminal process." *McKune*, 536 U.S. at 53, 122 S. Ct. at 2035, 153 L. Ed. 2d at 69 (O'Connor, J., concurring). Section 903A.2(1)(*a*), which established this requirement, was the law both when Harkins was alleged to have sexually assaulted his victim, and when he was convicted of doing so. Thus, from the moment Harkins committed his crime, it was clear that if he was convicted and chose not to participate in the prescribed treatment program, he would not be eligible for earned-time credits. That was the set of consequences for his conduct prescribed by the legislature.

Encouraging a convicted sex offender to participate in a SOTP where he has to acknowledge his crime also serves important rehabilitative goals. The State of Iowa is not "starkly . . . attempt[ing] to compel testimony." *Id.* Rather, the undisputed purpose of the program is to get the offender to confront his or her past behavior so it does not reoccur. Harkins does not claim that he will be forced to disclose other, as-yet-unknown sex offenses. *Cf. Antelope*, 395 F.3d at 1137. In fact, the only admission the State could obtain here is one it almost certainly does not need, since Harkins has been convicted and his conviction has been upheld on direct appeal.

The specifics of this case illustrate what the legislature might have had in mind when it enacted section 903A.2(1)(*a*). The evidence, summarized above, supports a finding that Harkins committed a rather violent sexual assault. Harkins's original story to the police was that he had not had sexual relations with the victim. At trial, Harkins changed course and admitted having had sex with the victim, but claimed it was consensual. Now, according to a memo that is part of the record, Harkins maintains, "I am not guilty and am not going to take the

program." Under these circumstances, a rehabilitation program requiring the offender to confront his past offense might be particularly beneficial. We do not see the Fifth Amendment as a barrier to an earned-credit incentive for Harkins to participate in such a program.

Both the plurality and the special concurrence in *McKune* indicated that compulsion in the prison setting is not a simple question of, "How big is the stick or carrot?" Instead, Justice Kennedy and Justice O'Connor recognized that a convicted criminal defendant may be confronted with choices, such as whether to take the stand at a clemency hearing or whether to participate in sex offender treatment, which might be considered compulsion in other circumstances, but are deemed legitimate exercises of state authority here. We therefore need to ask whether the choice arose as a result of the defendant's conviction within the criminal justice system and whether imposing the choice serves a proper goal of that system. We have and we believe the answers are clear.

Thus, while a loss of eligibility for earned-time credits clearly "implicates a liberty interest," *Reilly v. Iowa Dist. Ct.*, 783 N.W.2d 490, 496 (Iowa 2010), it does not equate in this case with unconstitutional compulsion. The State is not using a threatened loss of credits to try to extract testimony; instead, it is attempting to administer a bona fide rehabilitation program for sex offenders who have already been found guilty under a statutory scheme that afforded them all required due process.

We also find support for this conclusion in *In re C.H.*, 652 N.W.2d 144 (Iowa 2002), where we addressed a father's claim that his Fifth Amendment rights had been violated when his parental rights were terminated after he failed to complete a sex offender treatment program.

We made clear that "sexual offender treatment where the offender refuses to take responsibility for the abuse may constitute ineffective therapy," and that the State of Iowa could terminate parental rights based on a parent sex offender's "failure to obtain treatment for his or her problems." *In re C.H.,* 652 N.W.2d at 150. We specifically noted that "a person's exercise of a constitutional right *may* indeed have consequences"—without resulting in a Fifth Amendment violation. *Id.* Just as in *C.H.*, where we held that a father who failed to complete a treatment program due to his assertion of Fifth Amendment rights could suffer loss of parental rights, so here we hold that a convicted sex offender who failed to complete a treatment program due to his assertion of Fifth Amendment rights may constitutionally have his eligibility for earned-time credits suspended. If the loss of parental rights does not amount to unconstitutional compulsion, it is difficult to see how the suspension of earned-time credits would either—so long as in both cases the State is not simply trying to obtain testimony for future use.[4]

**IV. Conclusion.**

Harkins had every right not to be a witness against himself, a right he actually chose to waive at trial by taking the stand. Now that he has been convicted as a sex offender, though, the State of Iowa may constitutionally establish an incentive for him to obtain treatment in prison by withholding earned-time credits if he declines to participate.

---

[4]It is true we said in *C.H.*, "The State may require parents to otherwise undergo treatment, but it may not specifically require an admission of guilt as part of the treatment." 652 N.W.2d at 150. Thus, a distinction exists between the present case, where the SOTP expressly requires acceptance of responsibility, and *C.H.*, where the State simply required *treatment* and admission of responsibility was part of the treatment. Yet the more significant distinction cuts the other way. In this case, Harkins has already been convicted of a sex offense in a criminal proceeding; in *C.H.*, the father had not been. Hence, there were more grounds for concern in *C.H.* about "stark[] government attempts to compel testimony." *McKune,* 536 U.S. at 53, 122 S. Ct. at 2035, 153 L. Ed. 2d at 69 (O'Connor, J., concurring).

For the foregoing reasons, we sustain the writ requested by the State, we set aside the district court's order to the extent it reinstated Harkins's earned time for the period July 9, 2008, through March 21, 2009, and we remand for further proceedings consistent herewith.

**STATE'S WRIT SUSTAINED; HARKINS'S WRIT ANNULLED; CASE REMANDED.**

All justices concur except Wiggins, Hecht, and Appel, JJ., who dissent.

#09–0982, *State v. Iowa Dist. Ct./Harkins v. Iowa Dist. Ct.*

**APPEL, Justice (dissenting).**

I respectfully dissent. I would hold that Harkins is entitled to use and derivative-use immunity under the Federal Constitution with respect to incriminating statements that he may be required to make pursuant to his participation in the sex offender treatment program (SOTP) in this case.

### I. Factual and Procedural Background.

The facts are simple and undisputed. Harkins has been convicted of a sex crime. The State of Iowa has determined that he should receive treatment in prison for sex offenders. The SOTP requires Harkins to accept full responsibility for his offenses and behavior. The program also requires that Harkins agree to undergo a polygraph examination. If Harkins declines to participate in the SOTP, he will not receive earned-time credit. Simply put, if he chooses to remain silent by not participating in the program, he will likely be incarcerated for a substantially longer period of time.

Harkins cries foul. He filed without the assistance of counsel a petition in district court challenging the process as violating his privilege against self-incrimination. Harkins claims if he participates in the SOTP and makes the required disclosures, he could be criminally prosecuted for perjury because of his testimony in the underlying criminal trial. Harkins further asserts that the admissions required in the SOTP could be used against him in a subsequent trial on the underlying offense if he is granted a new trial on postconviction relief. He claims that he is entitled to use immunity. In the district court, he did not identify whether he was proceeding under the Federal or State Constitution.

The district court granted Harkins's application in part and denied it in part. Harkins filed a writ of certiorari. In his pro se briefing, he declared that he was proceeding based on "the Fifth Amendment right against self-incrimination . . . and [the] right to due process."

**II. Analysis Under Federal Constitution.**

**A. Background to Fifth Amendment.** The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. A brief review of the historical background of the Fifth Amendment provides the context of my consideration of this case.

After the Norman Conquest, ecclesiastical courts were established to settle disputes. Leonard W. Levy, *Origins of the Fifth Amendment: The Right Against Self-Incrimination* 43 (Macmillan Publ'g Co., 2d ed. 1986) [hereinafter Levy]. These courts were inquisitorial in nature. *Id.* at 45. Persons were forced to appear and subject themselves to general examination under oath without knowledge of the charges being investigated. *Id.*; Stefan J. Padfield, *Self-Incrimination and Acceptance of Responsibility in Prison Sex Offender Treatment Programs*, 49 U. Kan. L. Rev. 487, 491 (2001). The most infamous of these courts was the "Star Chamber." *See* Mark A. Godsey, *Rethinking the Involuntary Confession Rule: Toward A Workable Test for Identifying Compelled Self-Incrimination*, 93 Cal. L. Rev. 465, 481 (2005).

Star Chamber proceedings were classic fishing expeditions in which interrogators could roam far and wide in an attempt to establish misconduct of persons under examination. *See* Akhil Reed Amar & Renee B. Lettow, *Fifth Amendment Principles: The Self-Incrimination Clause*, 93 Mich. L. Rev. 857, 896 (1995); Kenworthey Bilz, *Self-Incrimination Doctrine Is Dead; Long Live Self-Incrimination Doctrine:*

*Confessions, Scientific Evidence, and the Anxieties of the Liberal State*, 30 Cardozo L. Rev. 807, 846 (2008). A person appearing before the Star Chamber had no notice of charges and was forced, under oath, to answer any and all questions. Levy at 50–51; 8 John Henry Wigmore, *Evidence in Trials at Common Law* § 2250, at 278 & n.43 (McNaughton rev. ed. 1961). The Star Chamber presented the target with a classic Hobson's choice: answer questions and incriminate yourself or do not answer questions and be punished for your silence.

Common law courts eventually supplanted the ecclesiastic authorities and rejected, in large part, the inquisitorial approach. David Heim, Note, *Damned If You Do, Damned If You Don't—Why Minnesota's Prison-Based Sex Offender Treatment Program Violates the Right Against Self-Incrimination*, 32 Wm. Mitchell L. Rev. 1217, 1226 (2006). At common law, in addition to a right to be free from compelled testimony, an affirmative right to remain silent developed—a right that was recognized both in court proceedings and in interrogations by agents of the state. *Id.* These restrictions, however, were mere rules of evidence.

State constitutions enacted after the American Revolution, but prior to the constitutional convention, embraced the right against self-incrimination as a constitutional norm. For example, the Virginia Declaration of Rights provided "in all capital or criminal prosecutions a man . . . cannot . . . *be compelled to give evidence against himself.*" Levy at 405–06. The framers relied on these state constitutional precedents in fashioning the Fifth Amendment to the United States Constitution. *Id.* at 409. While it is commonly believed that state constitutional provisions were modeled after the Federal Constitution, the opposite is generally true with respect to the Fifth Amendment. *See id.*

The purposes of the Fifth Amendment have been discussed in numerous cases in both state and federal courts. In *Murphy v. Waterfront Commission of New York Harbor*, 378 U.S. 52, 84 S. Ct. 1594, 12 L. Ed. 2d 678 (1964), the United States Supreme Court stated that the Fifth Amendment:

> [R]eflects . . . our unwillingness to subject those suspected of crime to the cruel trilemma of self-accusation, perjury or contempt; our preference for an accusatorial rather than an inquisitorial system of criminal justice; . . . our sense of fair play which dictates a fair state-individual balance by requiring the government to leave the individual alone until good cause is shown for disturbing him and by requiring the government in its contest with the individual to shoulder the entire load; . . . our distru[s]t of self-deprecatory statements; and our realization that the privilege, while sometimes a shelter to the guilty, is often a protection to the innocent.

*Murphy*, 378 U.S. at 55, 84 S. Ct. at 1596–97, 12 L. Ed. 2d at 681 (internal quotation marks and citations omitted).

**B. Framework for Resolution of Fifth Amendment Issues.** While murky on the edges, the United States Supreme Court has established a general framework for analysis of Fifth Amendment issues. It is well established that the Fifth Amendment applies in any proceeding, criminal or civil, in which officials seek answers that might incriminate the party providing the responses in future criminal proceedings. *Lefkowitz v. Turley*, 414 U.S. 70, 77, 94 S. Ct. 316, 322, 38 L. Ed. 2d 274, 281 (1973). There is thus no dispute that requiring statements from a prisoner as part of a sex offender treatment program is within the scope of proceedings where the protections of the Fifth Amendment apply.

In addition, while the Fifth Amendment privilege is not always self-executing, *United States v. Monia*, 317 U.S. 424, 427, 63 S. Ct. 409, 410–11, 87 L. Ed. 376, 380 (1943), the facts establish that Harkins timely

asserted the privilege. He has refused to participate in the SOTP explicitly on self-incrimination grounds.

Finally, while the Fifth Amendment applies only where the statements sought by the state might incriminate the person asserting the privilege in future criminal proceedings, *Lefkowitz*, 414 U.S. at 77, 94 S. Ct. at 322, 38 L. Ed. 2d at 281, there is no question in this case that Harkins meets this threshold requirement. The Iowa SOTP requires that Harkins accept responsibility for his offenses and behavior without any assurances of confidentiality or immunity from prosecution if he provides the information required.

The remaining question of Harkins's Fifth Amendment claim is whether the SOTP compels Harkins to make incriminating statements. It has generally been held that truly voluntary statements may be admitted without violating the Fifth Amendment. *Garner v. United States*, 424 U.S. 648, 654, 96 S. Ct. 1178, 1182, 47 L. Ed. 2d 370, 377 (1976). Even when statements are otherwise the product of compulsion, however, any potential constitutional infirmity under the Fifth Amendment may be resolved if the state provides use and derivative-use immunity from prosecution. *Kastigar v. United States*, 406 U.S. 441, 459–62, 92 S. Ct. 1653, 1664–65, 32 L. Ed. 2d 212, 225–27 (1972).

In this case, the State of Iowa has given Harkins a choice: participate in a program that requires him to accept full responsibility for his offenses and behavior or lose his entitlement to earned-time credits and stay in prison longer.

The nub of this case is whether the State of Iowa can force Harkins to make this choice consistent with the Fifth Amendment or whether the State must provide Harkins with *Kastigar*-type immunity from future prosecution for the program to survive Fifth Amendment review.

Reaching a decision in this case is made somewhat complex because of a highly fractured Supreme Court opinion in a key case involving the Fifth Amendment rights of prisoners required to participate in sex offender therapy programs—*McKune v. Lile*, 536 U.S. 24, 122 S. Ct. 2017, 153 L. Ed. 2d 47 (2002).

**C. Pre-*McKune* Development of Fifth Amendment Element of Compulsion By the United States Supreme Court.**

1. *Early cases involving compulsion.* Early United States Supreme Court cases considered the question of whether statements made by an accused were compelled under the Fifth Amendment. For instance, in *Brown v. Walker*, 161 U.S. 591, 596–97, 16 S. Ct. 644, 647, 40 L. Ed. 819, 821 (1896), the Supreme Court, noting that the Fifth Amendment was a protest against inquisitorial methods, observed that the temptation

> to press the witness unduly, to browbeat him if he be timid or reluctant, to push him into a corner, and to entrap him into fatal contradictions . . . made the system so odious as to give rise to a demand for its total abolition.

Similarly, in *Bram v. United States*, 168 U.S. 532, 18 S. Ct. 183, 42 L. Ed. 568 (1897), the Supreme Court cited with favor English precedent, which declared: "A confession . . . which is obtained from a defendant, either by the flattery of hope, or by the impressions of fear, however slightly the emotions may be implanted is not admissible evidence." *Bram*, 168 U.S. at 547, 18 S. Ct. at 188, 42 L. Ed. at 575 (internal quotation marks and citation omitted). The *Bram* Court noted that because the law cannot measure the precise power of the influence exerted against the accused, the declaration must be excluded if *any* influence has been exerted to obtain the statement. *Id.* at 565, 18 S. Ct. at 195, 42 L. Ed. at 581.

As late as 1964, in *Malloy v. Hogan*, 378 U.S. 1, 7, 84 S. Ct. 1489, 1493, 12 L. Ed. 2d 653, 659 (1964), the Supreme Court observed that the Fifth Amendment was the "essential mainstay" of our "American system of criminal prosecution." The Court noted that the Fifth Amendment protected a defendant's " 'free choice to admit, to deny, or to refuse to answer' " questions posed by the state. *Malloy*, 378 U.S. at 7, 84 S. Ct. at 1493, 12 L. Ed. 2d at 659 (quoting *Lisenba v. California*, 314 U.S. 219, 241, 62 S. Ct. 280, 292, 86 L. Ed. 166, 182 (1941)). The Court further stated that it had held inadmissible "a confession secured by so mild a whip as the refusal . . . to allow a suspect to call his wife until he confessed." *Id.*

Plainly, these early cases under the Fifth Amendment were generous to the accused and strongly emphasized the need for liberal construction of the Fifth Amendment in order to protect the underlying rights of the accused.

2. *Development of concept of penalty and costs.* Beginning with *Griffin v. California,* 380 U.S. 609, 85 S. Ct. 1229, 14 L. Ed. 2d 106 (1965), the Supreme Court began to characterize the issue of compelled testimony under the Fifth Amendment in terms of "penalty" or "costs." In *Griffin*, the defendant refused to testify. *Griffin*, 380 U.S. at 609–10, 85 S. Ct. at 1230, 14 L. Ed. 2d at 107. In closing, the prosecutor argued that the jury could draw an adverse inference from this failure. *Id.* at 610–11, 85 S. Ct. at 1231, 14 L. Ed. 2d at 107–08. The trial court also instructed the jury that, while the defendant had a constitutional right not to testify, the jury could draw an adverse inference from his failure. *Id.* at 610, 85 S. Ct. at 1230, 14 L. Ed. 2d at 107. The Supreme Court held that the comment of the prosecutor and the trial court instruction impermissibly imposed a penalty on the exercise of the constitutional

right to remain silent. *Id.* at 614–15, 85 S. Ct. at 1232–33, 14 L. Ed. 2d at 109–10. In particular, the Court noted that the prosecution's commentary "cuts down on the privilege by making its assertion costly." *Id.* at 614, 85 S. Ct. at 1233, 14 L. Ed. 2d at 110.

The Supreme Court also found threats of termination of employment violated the Fifth Amendment because the threatened discharge imposed a penalty on the right to remain silent. *See Gardner v. Broderick*, 392 U.S. 273, 279, 88 S. Ct. 1913, 1916, 20 L. Ed. 2d 1082, 1087 (1968); *see also Garrity v. New Jersey*, 385 U.S. 493, 497–98, 87 S. Ct. 616, 618–19, 17 L. Ed. 2d 562, 565–66 (1967). In *Garrity*, the Court emphasized that the protection against coerced statements is a right "of constitutional stature whose exercise a State may not condition by the exaction of a price." *Garrity*, 385 U.S. at 500, 87 S. Ct. at 620, 17 L. Ed. 2d at 567.

In a case decided the same day as *Garrity*, the Supreme Court, in *Spevack v. Klein*, 385 U.S. 511, 512–13, 87 S. Ct. 625, 626–27, 17 L. Ed. 2d 574, 576 (1967), considered a case in which an attorney was disbarred for refusing to testify at a judicial inquiry and failing to comply with a subpoena duces tecum calling for the production of financial records. The *Spevack* Court noted that a penalty "is not restricted to a fine or imprisonment" and includes "the imposition of any sanction which makes assertion of the Fifth Amendment privilege 'costly.'" *Spevack*, 385 U.S. at 515, 87 S. Ct. at 628, 17 L. Ed. 2d at 577 (quoting *Griffin*, 380 U.S. at 614, 85 S. Ct. at 1233, 14 L. Ed. 2d at 110). The Court continued, warning:

> "It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal

> modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon."

*Id.* (quoting *Boyd v. United States*, 116 U.S. 616, 635, 6 S. Ct. 524, 535, 29 L. Ed. 746, 752 (1886), *abrogated on other grounds by Warden v. Hayden*, 387 U.S. 294, 87 S. Ct. 1642, 18 L. Ed. 2d 782 (1967)). Similarly, in *Uniformed Sanitation Men Association v. Commissioner of Sanitation*, 392 U.S. 280, 283–84, 88 S. Ct. 1917, 1919, 20 L. Ed. 2d 1089, 1092–93 (1968), the Supreme Court held that the discharge of public employees for invoking and refusing to waive the privilege against self-incrimination, during an investigation of the employees, violated the employees' Fifth Amendment rights.

In *Lefkowitz*, the Supreme Court considered whether the potential loss of business contracts for licensed architects constituted a penalty under the Fifth Amendment. *Lefkowitz*, 414 U.S. at 71–73, 94 S. Ct. at 320–21, 38 L. Ed. 2d at 278–80. In *Lefkowitz*, the Court emphasized the role of immunity in overcoming potential Fifth Amendment objections. *Id.* at 84–85, 94 S. Ct. at 325–26, 38 L. Ed. 2d at 285–86. According to the majority, employees must be offered "whatever immunity is required to supplant the privilege" and may not be required to "waive such immunity." *Id.* at 85, 94 S. Ct. at 326, 38 L. Ed. 2d at 286. In *Kastigar*, the Supreme Court determined that use and derivative-use immunity was sufficient to satisfy Fifth Amendment concerns arising from otherwise compelled testimony. *Kastigar*, 406 U.S. at 458, 92 S. Ct. at 1664, 32 L. Ed. 2d at 225.

3. *Pre-*McKune *penalty cases involving Fifth Amendment rights of persons convicted of crimes.* The first case in which the United States Supreme Court considered the issue of compelled testimony under the Fifth Amendment in the context of prisoners was *Baxter v. Palmigiano,* 425 U.S. 308, 96 S. Ct. 1551, 47 L. Ed. 2d 810 (1976). In *Baxter,* the majority held that permitting adverse inferences to be drawn from an inmate's silence at a disciplinary proceeding was not, on its face, an invalid practice. *Baxter*, 425 U.S. at 320, 96 S. Ct. at 1559, 47 L. Ed. 2d at 822. The majority emphasized that the inmate's silence at the disciplinary hearing was in and of itself insufficient to support an adverse disciplinary decision. *Id.* at 317, 96 S. Ct. at 1557, 47 L. Ed. 2d at 821. As a result, the Court emphasized that "the case is *very different*" from the *Garrity-Lefkowitz* decisions, "where refusal to submit to interrogation and to waive [a] Fifth Amendment privilege, standing alone and without regard to other evidence, resulted in loss of employment or opportunity to contract with the State." *Id.* at 318, 96 S. Ct. at 1557–58, 47 L. Ed. 2d at 821 (emphasis added).

The Court next confronted a Fifth Amendment question in the context of probation. In *Minnesota v. Murphy,* 465 U.S. 420, 422, 104 S. Ct. 1136, 1139, 79 L. Ed. 2d 409, 416 (1984), a probationer was required, as a condition of probation, to regularly meet with his probation officer. During his required appearance, the probationer admitted that he committed a rape and murder. *Murphy*, 465 U.S. at 424, 104 S. Ct. at 1140, 79 L. Ed. 2d at 417. After a grand jury returned an indictment for murder, the probationer sought to suppress the incriminating statements on Fifth Amendment grounds. *Id.* at 425, 104 S. Ct. at 1141, 79 L. Ed. 2d at 417. The Supreme Court, under the facts presented, held that there was no Fifth Amendment violation because the

probationer did not timely assert his Fifth Amendment privilege during the interview with the probation officer. *Id.* at 440, 104 S. Ct. at 1149, 79 L. Ed. 2d at 428. The Supreme Court majority repeatedly framed the issue as one of "waiver" and "timely" assertion of Fifth Amendment rights. *Id.* at 428–29, 437–40, 104 S. Ct. at 1142–43, 1147–49, 79 L. Ed. 2d at 420, 426–28.

The *Murphy* Court distinguished the penalty cases. While a timely assertion of Fifth Amendment privileges was not required in penalty cases, the *Murphy* Court noted that the state did not impose a penalty because the probationer was only required to appear before his probation officer and discuss matters concerning probation. *Id.* at 435, 104 S. Ct. at 1146, 79 L. Ed. 2d at 424. The state did not require the probationer to surrender his Fifth Amendment privilege or face a penalty. *Id.* at 436–37, 104 S. Ct. at 1147, 79 L. Ed. 2d at 425–26. Once the probation officer exercised his discretion to ask questions requiring the probationer to provide potentially incriminating answers, the probationer was required to assert the privilege. *Id.* at 437–38, 104 S. Ct. at 1147–48, 79 L. Ed. 2d at 426–27. At that point, the state would have the option of dropping the inquiry or providing immunity sufficient to address the privilege.[5] *Id.* at 435 n.7, 104 S. Ct. at 1146 n.7, 79 L. Ed. 2d at 425 n.7.

The *Murphy* Court emphasized, however, that the probationer did not lose his Fifth Amendment protection simply because he had been

---

[5]Justice Marshall, joined by Justice Stevens in part and by Justice Brennan, dissented. The dissent recognized that the key issue in the case was whether the probationer was required to timely assert the privilege or whether the privilege was self-executing. *Murphy*, 465 U.S. at 442, 104 S. Ct. at 1150, 79 L. Ed. 2d at 429 (Marshall, J., dissenting) (asserting that the flaw in the majority's approach lies not in analysis of constitutional rights, but in finding that rights were not violated in this case because of Murphy's failure to assert privilege).

convicted of a prior crime. *Id.* at 426, 104 S. Ct. at 1141, 79 L. Ed. 2d at 418. Further, the *Murphy* Court implied that the outcome would have been different if the probationer had timely invoked his Fifth Amendment privileges. *See id.* at 435, 104 S. Ct. at 1146, 79 L. Ed. 2d at 424–25. As noted by the *Murphy* Court:

> There is . . . a substantial basis in our cases for concluding that if the State, either expressly or by implication, asserts that invocation of the privilege would lead to revocation of probation, it would have created the classic penalty situation, the failure to assert the privilege would be excused, and the probationer's answers would be deemed compelled and inadmissible in a criminal prosecution.

*Id.* Plainly, *Murphy* turned on the fact that the probationer waived his Fifth Amendment rights by responding to the probation officer's questions. *See id.* at 429, 104 S. Ct. at 1143, 79 L. Ed. 2d at 420.

In *Ohio Adult Parole Authority v. Woodard*, 523 U.S. 272, 277, 118 S. Ct. 1244, 1248, 140 L. Ed. 2d 387, 394 (1998), a state prisoner sentenced to death alleged that Ohio's clemency statute violated his Fifth Amendment right to remain silent. The prisoner claimed that there was a substantial risk of incrimination because postconviction proceedings were in progress and also because he could potentially incriminate himself on other crimes at the clemency interview. *Woodard*, 523 U.S. at 285, 118 S. Ct. at 1252, 140 L. Ed. 2d at 399. Though the Supreme Court was highly divided on a number of issues, it unanimously held that giving an inmate the option of voluntarily participating in an interview as part of the clemency process does not offend the Fifth Amendment. *Id.* at 287–88, 118 S. Ct. at 1253, 140 L. Ed. 2d at 400–01. According to the Court, the prisoner failed to establish that his testimony at a clemency hearing would be "compelled" under the Fifth Amendment. *Id.* at 286, 118 S. Ct. at 1252, 140 L. Ed. 2d at 399–400. The choice of

whether to participate in a clemency hearing, according to the Court, was no different than the choice to take the stand in a criminal case. *Id.* at 286–87, 118 S. Ct. at 1252–53, 140 L. Ed. 2d at 400. No *automatic* sanction attached to the refusal to participate in the clemency hearing other than potential impact on the clemency hearing itself. *See id.*

**D. Pre-*McKune* Case Law Regarding Fifth Amendment Implications of Sex Offender Therapy Programs.**

1. *Approach of lower federal courts and state courts.* Prior to *McKune*, the results of court challenges to required sex offender treatment programs were mixed. In *Mace v. Amestoy*, 765 F. Supp. 847, 850–51 (D. Vt. 1991), a federal district court held that the Fifth Amendment is violated when a sex offender is required to disclose past misconduct as a condition of probation or a court-suspended sentence. The *Mace* court distinguished *Murphy* on the ground that the probationer in *Mace* was required to detail sexual history, not simply make truthful statements to a probation officer. *Mace*, 765 F. Supp. at 851. Thus, in *Mace*, the court concluded that the privilege was self-executing and placed the petitioner in a "classic penalty" situation. *Id.* The *Mace* court recognized the legitimate state interest in rehabilitation, but observed that citizens cannot be forced to incriminate themselves merely because it advances a governmental need. *Id.* at 852; *see also State v. Imlay*, 813 P.2d 979, 985 (Mont. 1991) (finding "the better reasoned decisions are those decisions which protect the defendant's constitutional right against self-incrimination, and which prohibit augmenting a defendant's sentence because he refuses to confess to a crime or invokes his privilege against self-incrimination").

Other courts, however, were less sympathetic to claims of Fifth Amendment violations in the context of sex offender treatment programs.

Some courts refused to grant relief on factual grounds. For instance, in *Doe v. Sauer*, 186 F.3d 903, 906 (8th Cir. 1999), the Eighth Circuit held an Iowa sex offender was not entitled to relief in a § 1983 action on the ground that he was denied parole because of his refusal to incriminate himself as required by Iowa authorities as part of a sex offender treatment program. The *Doe* court emphasized, however, that Doe had failed to provide any factual evidence that he was denied parole based upon his exercise of Fifth Amendment rights and not solely based upon the seriousness of the offense or his refusal to participate in rehabilitation. *Doe*, 186 F.3d at 905–06.

On the other hand, the Supreme Court of Minnesota in *State ex rel. Morrow v. LaFleur*, 590 N.W.2d 787, 792 (Minn. 1999), *abrogated by Johnson v. Fabian*, 735 N.W.2d 295, 305 (Minn. 2007), considered whether a Minnesota sex offender therapy program requiring participants to admit the conduct for which they were convicted violated the Fifth Amendment. While the majority noted that an offender who declined to participate was denied early release from prison, it drew a distinction between early release from one's sentence, which was not a penalty under the Fifth Amendment, and revocation of probation, which was such a penalty. *Morrow*, 590 N.W.2d at 793. The *Morrow* majority opinion, however, drew a sharp dissent which found the distinction unpersuasive and noted the fact that the State of Minnesota had a legitimate interest in rehabilitating sex offenders had nothing to do with the question of whether the admissions in Minnesota's sex therapy program were compelled. *Id.* at 797–98 (Page, J., dissenting).

At least one pre-*McKune* court, however, focused on whether denial of parole or probation automatically followed the exercise of Fifth Amendment rights in sex therapy programs. In *Ainsworth v. Risley*, 244

F.3d 209 (lst Cir. 2001), the court attempted to reconcile potentially inconsistent cases by noting the distinction between cases where the denial of parole was automatic and those where the denial of parole rested in the discretion of prison authorities. *Risley*, 244 F.3d at 220, *vacated by Ainsworth v. Stanley*, 536 U.S. 953, 122 S. Ct. 2652, 153 L. Ed. 2d 829 (2002) (judgment vacated and case remanded for further consideration in light of *McKune*).

2. *Approach of lower federal courts to Fifth Amendment implications of sex therapy programs in* McKune*.* In *Lile v. McKune*, 24 F. Supp. 2d 1152, 1155 (D. Kan. 1998), the federal district court considered whether a Kansas prison-based sex therapy program violated the Fifth Amendment rights of a prisoner, Robert Lile, who had been convicted of sex offenses. At the time of his challenge, Lile had a pending habeas corpus petition attacking his state court conviction. *McKune*, 24 F. Supp. 2d at 1154. Although he was not required to participate in a sex offender therapy program at the beginning of his incarceration, Lile's prison counselor added the program to Lile's inmate program agreement. *Id.* at 1154–55. After an unsuccessful administrative challenge to the addition of the program, Lile signed the modified program, but refused to participate in sex offender treatment in part because it required him to sign an "Admission of Guilt" form. *Id.* at 1155. He also objected to a program requirement that he provide a written sexual history of all his prior sexual activities, including uncharged criminal offenses. *Id.*

The consequence of failure to participate in the program included transfer to a maximum security setting. *Id.* In a maximum security setting, Lile would not have access to a personal television. *Id.* In addition, Lile would be placed in a more dangerous environment and would not be able to earn more than $0.60 a day for prison pay. *Id.*

Restrictions would also be placed on visitation. *Id.* Further, the maximum security setting limited the programming available to Lile as well as the amount of personal property Lile could keep in his cell. *Id.*

The district court found that Lile's Fifth Amendment rights were violated. *Id.* at 1158. The district court found that, under the Kansas scheme, unlike that presented in *Woodard*, automatic sanctions were imposed for the assertion of Fifth Amendment rights. *Id.* Although the automatic sanctions did not arise to a protected "liberty" interest, there was no requirement that a liberty interest be implicated in order to establish compulsion under the Fifth Amendment. *Id.* at 1159.

On appeal, the United States Court of Appeals for the Tenth Circuit affirmed. *Lile v. McKune,* 224 F.3d 1175, 1189 (10th Cir. 2000). At the outset, the court noted that a refusal to participate in the program did not automatically disqualify an inmate from parole and did not lead to a loss of good-time credits. *Id.* at 1182. The only automatic sanction was the transfer from medium security to a maximum security setting and the resulting adverse consequences flowing from the transfer. *Id.*

Like the district court, however, the Tenth Circuit rejected the argument that a "liberty" interest must be implicated in order to establish compulsion under the Fifth Amendment. *Id.* at 1184. The Tenth Circuit agreed with the district court that " 'by grafting a protected liberty interest to a finding of compulsion, the standard is set too high.' " *Id.* at 1184 (quoting *McKune,* 24 F. Supp. 2d at 1159). The Tenth Circuit noted that the Supreme Court had held that threat of disbarment, damage to professional reputation, and loss of income amounted to impermissible compulsion without an explicit characterization of the deprivations as protected liberty interests. *Id.*

The Tenth Circuit distinguished the case from penalty cases where the Supreme Court had not found a Fifth Amendment violation. *Id.* at 1186. The Tenth Circuit thus found the case distinguishable from *Baxter*, in which silence was simply a factor that might be considered in a prison disciplinary hearing, but did not involve any automatic adverse consequences. *Id.* The court also distinguished *Woodard* by noting that, while the inmate who refuses to participate in a clemency proceeding may affect his chances of receiving clemency, *Woodard* involved no "separate and distinct substantial or potent consequences" that were automatically imposed by his refusal to participate. *Id.* at 1187. Finally, the court noted that, in *Murphy*, the plaintiff was not actually required to make incriminating statements. *Id.*

Although the Tenth Circuit determined that the Kansas policy imposed penalties that violated the Fifth Amendment privilege against self-incrimination, the court nonetheless proceeded to balance Lile's Fifth Amendment right against the prison's penological interests in maintaining the program under the four-factor test established in *Turner v. Safley*, 482 U.S. 78, 89–90, 107 S. Ct. 2254, 2262, 96 L. Ed. 2d 64, 79–80 (1987). *Id.* at 1190. While the court determined that the Kansas program was rationally connected to legitimate governmental interests in rehabilitation and public safety, it found that Lile had no alternative means of exercising his Fifth Amendment right. *Id.* at 1191. The court also concluded that accommodation of the Fifth Amendment right would not have a negative effect on guards, other prisoners, or prison resources. *Id.* Further, and most importantly, the court reasoned that the grant of use immunity or some form of privilege was an "obvious, easy alternative" to save the program from constitutional infirmity. *Id.* at 1191–92.

**E. Approach of United States Supreme Court to Fifth Amendment Implications of Sex Offender Therapy Programs in *McKune.*** After the Tenth Circuit decided the case, the Supreme Court granted the state's petition for writ of certiorari and reversed. *McKune*, 536 U.S. at 48, 122 S. Ct. at 2032, 153 L. Ed. 2d at 66 (Kennedy, J., plurality opinion). Justice Kennedy wrote a plurality opinion joined by Chief Justice Rehnquist, Justice Scalia, and Justice Thomas. Justice Kennedy concluded that Lile was not impermissibly compelled to incriminate himself and, therefore, was not entitled to use immunity. *Id.* at 35–36, 122 S. Ct. at 2025–26, 153 L. Ed. 2d at 58–59. Justice Stevens, joined by Justices Souter, Ginsberg, and Breyer, dissented. *Id.* at 54, 122 S. Ct. at 2035, 153 L. Ed. 2d at 70 (Stevens, J., dissenting). Justice Stevens declared that, without a grant of use immunity, the Kansas program would violate the Fifth Amendment. *Id.* at 69–72, 122 S. Ct. at 2043–45, 153 L. Ed. 2d at 80–81. Justice O'Connor wrote a concurring opinion that joined in the result reached by Justice Kennedy. *Id.* at 54, 122 S. Ct. at 2035, 153 L. Ed. 2d at 66 (O'Connor, J., concurring). Because Justice O'Connor's opinion provided a fifth vote in support of the judgment, the Supreme Court denied Lile relief. *See id.*

In his plurality opinion, Justice Kennedy repeatedly emphasized that the gravity of the consequences of declining to participate in the Kansas program did not amount to compelled testimony under the Fifth Amendment. Justice Kennedy characterized "the incentives" as "minimal." *Id.* at 29, 122 S. Ct. at 2022, 153 L. Ed. 2d at 54 (plurality opinion). He stressed that the consequences of a transfer to the maximum security unit were not ones that compel a prisoner to testify about past crimes. *Id.* at 36, 122 S. Ct. at 2026, 153 L. Ed. 2d at 58. Justice Kennedy observed that the decision regarding where to house an

inmate was at the core of prison administrators' expertise. *Id.* at 39, 122 S. Ct. at 2027, 153 L. Ed. 2d at 60.

In reaching his conclusions, Justice Kennedy utilized a due process test developed by the Court in *Sandin v. Conner*, 515 U.S. 472, 115 S. Ct. 2293, 132 L. Ed. 2d 418 (1995). *Id.* at 37, 122 S. Ct. at 2026–27, 153 L. Ed. 2d at 59–60. In *Sandin*, the Supreme Court held that a prisoner did not have a liberty interest for purposes of procedural due process in the terms and conditions of confinement unless they constituted "atypical and significant hardship[s] on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484, 115 S. Ct. at 2300, 132 L. Ed. 2d at 430. Justice Kennedy found that the *Sandin* framework provided "a reasonable means of assessing whether the response of prison administrators to correctional and rehabilitative necessities are so out of the ordinary that one could sensibly say they rise to the level of unconstitutional compulsion." *McKune*, 536 U.S. at 41, 122 S. Ct. at 2029, 153 L. Ed. 2d at 62 (plurality opinion).

Justice Kennedy wrote that determining compulsion was a question of judgment. *Id.* at 41, 122 S. Ct. at 2028, 153 L. Ed. 2d at 62. He found the administrative harms *de minimis* when compared to the harms in *Murphy*, *Woodard*, and *Baxter*. *Id.* at 42–43, 122 S. Ct. at 2029–30, 153 L. Ed. 2d at 63. Yet, Justice Kennedy pointedly noted that the Kansas program "did not extend [Lile's] term of incarceration," nor did it "affect [Lile's] eligibility for good-time credits or parole." *Id.* at 38, 122 S. Ct. at 2027, 153 L. Ed. 2d at 60.

Justice Stevens's dissent emphasized the Court's historic treatment of the Fifth Amendment and asserted that the Fifth Amendment guaranteed the right to remain silent unless one chose to speak " '*in the unfettered exercise of his own will, and to suffer no*

*penalty*' " for such silence. *Id.* at 56–58, 122 S. Ct. at 2037, 153 L. Ed. 2d at 72 (Stevens, J., dissenting) (quoting *Malloy*, 378 U.S. at 8, 84 S. Ct. at 1493–94, 12 L. Ed. 2d at 659). He challenged the plurality's treatment of *Woodard*, *Baxter*, and *Murphy*, noting that each turned not on the seriousness of the consequences but on other flaws in the asserted Fifth Amendment claims. *Id.* at 59–62, 122 S. Ct. at 2038–40, 153 L. Ed. 2d at 73–75.

Justice Stevens characterized as "wholly unpersuasive" the notion that the consequences suffered by Lile for invoking his Fifth Amendment rights were so insignificant as to not trigger Fifth Amendment protections. *Id.* at 64, 122 S. Ct. at 2041, 153 L. Ed. 2d at 77. Justice Stevens emphasized that the coerciveness of changes in prison conditions must be measured "not by comparing the quality of life in a prison environment with that in a free society, but rather by the contrast between the favored and disfavored classes of prisoners." *Id.* at 67, 122 S. Ct. at 2042–43, 153 L. Ed. 2d at 79. According to Justice Stevens, it was plain that the aggregate effect of the change in prison environment amounted to compulsion. *Id.*

Finally, Justice Stevens criticized the balancing approach in the plurality opinion. Citing *Lefkowitz*, he noted that the Court had previously rejected the notion that citizens may be forced to incriminate themselves because it served a governmental need. *Id.* at 68–69, 122 S. Ct. at 2043, 153 L. Ed. 2d at 79–80. He noted that the state could further its goals by granting use immunity or by establishing a voluntary program. *Id.* at 69–71, 122 S. Ct. at 2043–45, 153 L. Ed. 2d at 80–81. No matter what the goal, however, Justice Stevens wrote that inmates should not be compelled to forfeit the privilege against self-incrimination "simply because the ends are legitimate or because they have been

convicted of sex offenses." *Id.* at 71, 122 S. Ct. at 2045, 153 L. Ed. 2d at 81.

Justice O'Connor wrote that the standard for Fifth Amendment compulsion is broader than the "atypical and significant hardship" standard adopted in prison due process cases. *Id.* at 48, 122 S. Ct. at 2032, 153 L. Ed. 2d at 66–67 (O'Connor, J., concurring). Yet, she did not find the "alterations in respondent's prison conditions" so great as to constitute compulsion under the Fifth Amendment. *Id.* at 48–49, 122 S. Ct. at 2032–33, 153 L. Ed. 2d at 66–67. Instead, she found the alterations to be "minor" and that, while the conditions may have made the prison experience "more unpleasant," imposition of the conditions were "very unlikely to actually compel [Lile] to incriminate himself." *Id.* at 51, 122 S. Ct. at 2034, 153 L. Ed. 2d at 68. Regarding the transfer from a medium to maximum security area, Justice O'Connor noted that there were no findings about how great a danger arose from such a placement. *Id.*

But Justice O'Connor wrote that she did not believe penalties could include longer incarceration or execution. *Id.* at 52, 122 S. Ct. at 2034–35, 153 L. Ed. 2d at 69. According to Justice O'Connor, the imposition of such outcomes for refusing to incriminate oneself would surely implicate a "liberty" interest. *Id.* The logical implication of Justice O'Connor's concurrence is that, while a "liberty" interest is not a prerequisite for stating a Fifth Amendment compulsion claim, the sacrifice of a protected "liberty" interest would, at minimum, raise serious difficulties under the Fifth Amendment. *See id.*

Wholly absent from Justice O'Connor's opinion is the notion of balancing the Fifth Amendment rights of a prisoner against legitimate interests of the state. Her opinion focuses solely on what constitutes

compulsion under the Fifth Amendment. A majority of the Supreme Court has not embraced the balancing approach in Justice Kennedy's plurality opinion.

**F. Federal Case Law Subsequent to *McKune.*** Subsequent to *McKune*, federal courts have considered Fifth Amendment claims by prisoners in a number of contexts. Shortly after *McKune*, the Tenth Circuit decided *Searcy v. Simmons*, 299 F.3d 1220 (10th Cir. 2002). In *Searcy*, the facts differed from *McKune* in that the prisoner claimed that his good-time credits were impacted when he refused to incriminate himself in a sex offender therapy program. *Searcy*, 299 F.3d at 1223. The *Searcy* court concluded that, because the prisoner did not lose *guaranteed* good-time credits due to his refusal to participate in the sex offender therapy program, there was no constitutional violation. *Id.* at 1226; *see also Wirsching v. Colorado*, 360 F.3d 1191, 1203–04 (10th Cir. 2004) (no Fifth Amendment violation where loss of good-time credits is discretionary).

Similarly, in *Entzi v. Redmann*, 485 F.3d 998, 1000 (8th Cir. 2007), the Eighth Circuit considered a Fifth Amendment claim by a prisoner whose supervised probation was conditioned on participation in a sex offender program. While in prison, Entzi refused to comply with a state court order that he participate in a sex offender education class as a condition of probation. *Entzi*, 485 F.3d at 1000. The state filed a petition to revoke Entzi's probation based upon his failure to complete the program, but the state court dismissed the petition because it concluded that the program violated the Fifth Amendment. *Id.* at 1002. Entzi brought a § 1983 action claiming that the state violated the Fifth Amendment by filing the revocation petition and withholding his good-time credits for failing to participate in sex offender treatment. *Id.* at

1001. The district court granted summary judgment and judgment on the pleadings against Entzi, and Entzi appealed. *Id.* at 1001, 1003.

The Eighth Circuit denied relief. *Id.* at 1004. On the issue of probation, the court noted that the only consequence of the refusal to participate in the sex offender treatment program was the filing of a probation revocation petition, which the district court refused to grant. *Id.* at 1002. The mere filing of a petition, according to the Eighth Circuit, was not sufficient compulsion under the Fifth Amendment. *Id.* With respect to the good-time credit issue, the Eighth Circuit noted that, as in *Searcy,* there was no automatic revocation of good-time credits. *Id.* at 1004. Instead, the North Dakota Department of Corrections had discretionary authority to order, or not to order, such reductions. *Id.*

The Ninth Circuit faced a situation different than that in *Searcy* and *Entzi* in *United States v. Antelope,* 395 F.3d 1128 (9th Cir. 2005). Antelope was a convicted sex offender who was made an offer of supervised release from prison. *Antelope,* 395 F.3d at 1130. The offer was conditioned, however, upon participation in a sex offender therapy program where he was required to submit to polygraph examinations detailing his sexual history. *Id.* Antelope refused to submit to the polygraphs on Fifth Amendment grounds because of the risk that he might reveal past crimes that could lead to his prosecution. *Id.* at 1130. In response, the state twice revoked his conditional liberty and sent him back to prison. *Id.* at 1131. In *Antelope,* the Ninth Circuit reviewed the established Fifth Amendment case law and proceeded to analyze two prongs required to successfully invoke the Fifth Amendment: incrimination and compulsion. *Id.* at 1134.

With respect to incrimination, the Ninth Circuit found that the risk was "real and appreciable." *Id.* at 1135. Antelope was required to detail

his sexual history to a probation officer and submit to "full disclosure" polygraph examinations verifying his sexual history. *Id.* The sex offender therapy counselor testified that if Antelope revealed past sex offenses, he would turn over the evidence to prosecutorial authorities. *Id.* The counselor further testified that in the past his reports had resulted in convictions. *Id.* The disclosure form Antelope was required to sign specifically authorized the counselor to make such reports. *Id.*

The Ninth Circuit next turned to the compulsion prong. The court noted while Justice Kennedy's plurality opinion in *McKune* rejected reliance on "the so-called penalty cases," Justice O'Connor's concurring opinion found only that the penalties involved in *McKune* were not severe enough. *Id.* at 1136. The court further observed that Justice O'Connor rejected the notion that " 'penalties [like] longer incarceration' " were insufficient to trigger Fifth Amendment protection. *Id.* at 1137 (quoting *McKune*, 536 U.S. at 52, 122 S. Ct. at 2034, 153 L. Ed. 2d at 69 (O'Connor, J., concurring)).

Following Justice O'Connor's opinion, the Ninth Circuit held that the state could not sanction Antelope for his silence about *other* crimes. *Id.* Although the court recognized that the state had a legitimate purpose, the court stated that "[t]he irreconcilable constitutional problem . . . is that even though the disclosures sought here may serve a valid rehabilitative purpose, they also may be starkly incriminating." *Id.* at 1138. As a result, the Ninth Circuit found that Antelope was entitled to *Kastigar* immunity. *Id.* at 1140–41.

**G. Discussion of Fifth Amendment Issue.**

1. *Controlling authority in context of plurality opinions.* Justice Kennedy's plurality opinion in *McKune*—which imports the *Sandin* framework in determining whether a sex offender treatment program

exacts an unconstitutional penalty under the Fifth Amendment—represented a striking departure from Fifth Amendment case law. The approach of Justice Kennedy's plurality opinion, however, is not controlling in this case. When there is no majority opinion, the holding of the Supreme Court is expressed by those members of the Court who concurred in the judgment on the narrowest grounds. *Marks v. United States*, 430 U.S. 188, 193, 97 S. Ct. 990, 993, 51 L. Ed. 2d 260, 266 (1977). As a result, the standard articulated by Justice O'Connor is controlling.

2. *Application of approach of Supreme Court precedent.* The test established by Justice O'Connor's concurring opinion is less demanding than that of Justice Kennedy's plurality. The test to be applied by Justice O'Connor is somewhat opaque, but it is clearly a lower hurdle than the "atypical and significant hardship" standard applied in *Sandin. See McKune*, 536 U.S. at 48, 122 S. Ct. at 2032, 153 L. Ed. 2d at 66–67 (O'Connor, J., concurring). She stated that the case turned on the "minor" nature of the change in prison conditions. *Id.* at 51, 122 S. Ct. at 2034, 153 L. Ed. 2d at 68. Further, unlike in this case, Justice O'Connor emphasized that the period of incarceration was not extended. *Id.* at 52, 122 S. Ct. at 2034, 153 L. Ed. 2d at 69.

In addition, although not required by Justice O'Connor's concurring opinion, Harkins has demonstrated he has a "liberty" interest in his earned-time credits. In this case, by exercising his Fifth Amendment right, Harkins is *automatically* deprived of earned time to which he would be otherwise entitled. *See* Iowa Code § 903A.2(1)(*a*) (2007). We have held that a prisoner's interest in earned time under such a scheme is a liberty interest under *Sandin* that is afforded due process protection. *Reilly v. Iowa Dist. Ct.,* 783 N.W.2d 490, 495 (Iowa

2010). The language in Justice O'Connor's opinion strongly implies that the presence of a "liberty" interest would be problematic under the Fifth Amendment. *See McKune*, 536 U.S. at 52, 122 S. Ct. at 2034–35, 153 L. Ed. 2d at 69 (O'Connor, J., concurring).

Justice O'Connor does state that the proper theory should recognize that it is "generally acceptable" to impose risk of punishment "so long as actual imposition of such punishment is accomplished through a fair criminal process." *Id.* at 53, 122 S. Ct. at 2035, 153 L. Ed. 2d at 69. But a defendant does not receive "a fair criminal process" in a prosecution in which the defendant's compelled testimony is used against him.[6]

My approach is consistent with the evolving federal case law. The lower federal courts, for purposes of the Fifth Amendment, distinguish between loss of earned time at the discretion of prison authorities and loss of earned time that automatically results from an exercise of Fifth Amendment rights, both before and after *McKune*.[7] *Compare Antelope*, 395 F.3d at 1137–38 (finding compulsion where offer of released supervision from prison was conditioned upon revealing past crimes), *and Mace*, 765 F. Supp. at 850–51 (finding compulsion where probation conditioned on self-incrimination), *with Ainsworth*, 244 F.3d at 220 (finding no compulsion where parole not automatically denied for failure to complete course), *and Searcy*, 299 F.3d at 1226 (finding no

---

[6]If, however, this phraseology in Justice O'Connor's opinion should be interpreted as broadly as suggested by the majority, then Justice Kennedy's opinion becomes the narrowest ground. The presence of a "liberty interest" would be sufficient under Justice Kennedy's opinion to extend Fifth Amendment protection to Harkins. *See McKune*, 536 U.S. at 41, 122 S. Ct. at 2029, 153 L. Ed. 2d at 62 (plurality opinion).

[7]Our decision in *In re C.H.*, 652 N.W.2d 144 (Iowa 2002), is consistent with this distinction. In *In re C.H.*, there was no automatic termination of parental rights as a result of the failure of the parent to complete a sex therapy program. *In re C.H.*, 652 N.W.2d at 150. *In re C.H.* is thus more akin to *Woodard* than this case.

compulsion where eligibility for good-time credits vested within the discretion of penal authorities).

In light of Justice O'Connor's approach and the developing law in the federal appellate courts, I conclude that, under the Fifth Amendment, the State of Iowa must provide Harkins with immunity that is coextensive with the scope of his Fifth Amendment privilege if it seeks to subject Harkins to the loss of earned time if he declines to participate in the SOTP. Under *Kastigar*, it is clear that use and derivative-use immunity satisfies this requirement for purposes of the Fifth Amendment. *Kastigar*, 406 U.S. at 458, 92 S. Ct. at 1664, 32 L. Ed. 2d at 225.

In light of this analysis, I conclude that Harkins has established that the State imposes an impermissible penalty for the exercise of his Fifth Amendment rights. The State may force Harkins to choose between waving his Fifth Amendment rights and losing earned-time credit only if it provides Harkins with use and derivative-use immunity from prosecution.

### III. Preservation of State Constitutional Issue.

Independent state constitutional grounds for the right against self-incrimination are well established.[8] In a footnote, the majority indicates that Harkins has not preserved his state constitutional law claim.

---

[8]*See, e.g.*, *State v. Bowe*, 881 P.2d 538, 546–47 (Haw. 1994) (holding under Hawaii Constitution that coerced confession obtained by private party must be excluded); *State v. Isom*, 761 P.2d 524, 528–29 (Or. 1988) (holding that Oregon Constitution barred impeachment of defendant with prior inconsistent statements obtained in violation of *Miranda*); *Commonwealth v. Bussey*, 404 A.2d 1309, 1314 (Pa. 1979) (stating Pennsylvania Constitution requires proof of waiver of Fifth Amendment rights beyond a reasonable doubt); *Zuliani v. State*, 903 S.W.2d 812, 825 (Tex. Ct. App. 1995) (rejecting federal harmless error rule under Texas Constitution where physical violence applied to obtain confession); *State v. Wood*, 868 P.2d 70, 82 & n.2 (Utah 1993), *abrogated on other grounds by State v. Mirquet*, 914 P.2d 1144, 1147 n.2 (Utah 1996) (rejecting Supreme Court precedent in determining when person is "in custody" for purposes of Utah Constitution); *Westmark v. State*, 693 P.2d 220, 222 (Wyo. 1984)

The issue of whether Harkins preserved his state constitutional claim raises a close question. His primitive filings with the district court mention self-incrimination, but do not identify whether he poses a state or federal claim. Ordinarily, when a party generically refers to a constitutional claim with both state and federal counterparts but does not identify specifically which constitution he or she is proceeding under, we will consider the arguments raised under both constitutions. *King v. State*, 797 N.W.2d 565, 571 (Iowa 2011).

This case, however, raises a new procedural issue that we have not yet confronted. The majority suggests that Harkins waived his claim when the district court entered a ruling based solely on the Fifth Amendment and he failed to file a motion under Iowa Rule of Civil Procedure 1.904(2). In *Meier v. Senecaut*, 641 N.W.2d 532 (Iowa 2002), we noted that a motion for enlargement was necessary to preserve error " 'when the district court *fails to resolve* an issue, claim, or . . . legal theory properly submitted for adjudication.' " *Meier*, 641 N.W.2d at 539 (quoting *Explore Info. Servs. v. Iowa Ct. Info. Sys.*, 636 N.W.2d 50, 57 (Iowa 2001)). Under our cases, it is clear that the district court may consider state constitutional claims when a party simply identifies a constitutional principle that could have been brought under both constitutions. *King*, 797 N.W.2d at 571. When the district court does not consider the state constitutional issue, there is a question as to whether the claim is preserved under *Meier* in the absence of a motion

---

(holding postarrest silence may not be used against accused under Wyoming Constitution). *See generally* Mary A. Crossley, Note, Miranda *and the State Constitution: State Courts Take a Stand*, 39 Vand. L. Rev. 1693, 1717–30 (1986) (discussing various ways state courts have departed from federal precedent in interpreting state self-incrimination provisions); 2 Jennifer Friesen, *State Constitutional Law: Litigating Individual Rights, Claims and Defenses* § 12.09, at 12–112 to –115 (LexisNexis, 4th ed. 2006) (collecting cases).

for enlargement of the district court's conclusions. Where a party claiming constitutional rights does not distinguish between the Iowa Constitution and the Federal Constitution, the argument actually made is applied under both constitutions. *Id.* As a result, no party has been deprived of the opportunity to address a new substantive argument if *Meier* error-preservation rules do not apply.

In this case, however, not only was there a failure to file a motion for enlargement after the district court entered a ruling solely on the federal constitutional issue, there was a failure at the appellate level as well. The State argued that the issue of state constitutional law was not preserved. In response, Harkins cited Fifth Amendment cases and generally claimed that his "Fifth Amendment rights and the right to due process" were violated. When faced with an explicit challenge regarding whether he adequately raised a state constitutional claim with his vague district court pleadings, Harkins had an obligation at that point to fish or cut bait. If he had raised the state constitutional issue in his brief, the State would then have had an opportunity to reply to his state law argument. Harkins did not do so, and the majority's conclusion that we should not consider the state law claim in this unusual posture is probably correct.

I am, however, not entirely satisfied with this approach. A pro se plaintiff is not well schooled in legal niceties. This is not a case involving a prolix pleading where the nature of the claim is impossible to understand. We know exactly what the factual basis is for the claim. Yet, we have consistently held that where a party raises only a federal or state constitutional claim and does not mention or raise in an identifiable way the parallel constitutional provision, the claim under the parallel constitutional provision is not preserved. *See, e.g., State v. Palmer*, 791

N.W.2d 840, 844 (Iowa 2010); *State v. Allensworth*, 748 N.W.2d 789, 791 n.2 (Iowa 2008); *State v. Griffin*, 691 N.W.2d 734, 736–37 (Iowa 2005). We have further repeatedly stated that pro se litigants are not to be provided special treatment in the appellate process. *Colvin v. Story Cnty. Bd. of Review*, 653 N.W.2d 345, 348 n.1 (Iowa 2002); *Johnson v. Nickerson*, 542 N.W.2d 506, 513 (Iowa 1996); *State v. Walker*, 236 N.W.2d 292, 294 (Iowa 1975). The question of whether we should reconsider this approach is not before us. As a result, I conclude that the majority did not err when it declined to entertain a state constitutional challenge on appeal.

**IV. Conclusion.**

For the reasons stated above, I believe the writ requested by Harkins should be sustained, the State's writ annulled, and the case remanded for reinstatement of Harkins's earned-time credits after March 22, 2009.

Wiggins and Hecht, JJ., join this dissent.