# IN THE COURT OF APPEALS OF IOWA

No. 18-0159
Filed February 20, 2019

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**KEVIN JACOB MUEHLENTHALER,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Story County, Steven P. Van Marel,

District Associate Judge.


        Kevin Muehlenthaler appeals his convictions of three counts of sexual

exploitation by a school employee.  **AFFIRMED.**



        Joseph R. Cahill of Cahill Law Offices, Nevada, for appellant.

        Thomas J. Miller, Attorney General, and Thomas J. Ogden, Assistant

Attorney General, for appellee.



        Heard by Doyle, P.J., and Mullins and McDonald, JJ.

**MULLINS, Judge.**

Kevin Muehlenthaler appeals his convictions of three counts of sexual exploitation by a school employee. Muehlenthaler contends his trial counsel was ineffective in failing to object to: (1) the State's misstatement to the jury about Muehlenthaler's plea; (2) testimony about Muehlenthaler's alleged use of racially insensitive comments; (3) the State's questions which amounted to backdoor hearsay; (4) expert testimony provided by a non-expert; (5) the State's violation of its own motion in limine; and (6) the State's statements concerning Muehlenthaler's failure to testify or produce evidence. Muehlenthaler also claims the trial court erred in admitting into evidence statements he made during a school investigation.

## I.      Background Facts and Proceedings

From the evidence presented at trial, the jury could find the following facts. In the fall of 2013, Muehlenthaler was a part-time band instructor for the North Polk School District. At that time, K.M. was a sixteen-year-old high school senior who volunteered to assist Muehlenthaler with his band classes during her free periods. Her duties included assisting with set up and lessons, providing accompaniment on piano, grading papers, and assisting in a fundraiser. As the fall semester continued, both began sharing personal information about themselves, including family and home life. At some point in November, on a day K.M. was upset about family issues, Muehlenthaler asked for permission and proceeded to hug K.M. From that point on, Muehlenthaler would hug K.M. before she left his classroom for the day. The relationship also included Muehlenthaler making jokes of a sexual nature and divulging information about his sex life with his wife. Both parties then began emailing each other. K.M. continued volunteering during the 2014 spring

semester, including volunteering extra hours and days. This resulted in K.M. staying past the period she volunteered for and being late to her next class. Muehlenthaler signed off on her tardy slips.

In either January or February 2014, Muehlenthaler invited K.M. to his house after an evening basketball game, informing her that his wife would not be there. On this occasion, they sat and laid on his couch with their clothes on, "spooning and cuddling." K.M. also met Muehlenthaler on Valentine's Day in downtown Ames to assist in delivering thank-you cards to businesses that had helped during a school event. After handing out the cards, Muehlenthaler and K.M. sat in his car and talked. On another occasion after Valentine's Day, they met in a store parking lot and cuddled in K.M.'s van. On this occasion, Muehlenthaler reached under K.M.'s shirt and touched her breasts.

Muehlenthaler and K.M. text messaged one another frequently, including sexual content.[1] At some point in February, while in his classroom, Muehlenthaler asked K.M. if she wanted to have sex. After agreeing, Muehlenthaler and K.M. texted their plans on when and where they planned to have sex. Muehlenthaler and K.M. met at a local motel. K.M. waited in her car as Muehlenthaler went in to purchase a room. On that date, someone checked in under the name of P.S., the name of K.M.'s classmate. This individual paid in cash and there is no record of any identification provided to the motel employee. The motel's policy is to not provide a room without appropriate identification; however, a front desk clerk testified that not all staff have followed this policy. K.M. testified this person was

---

[1] The exact content of their text messages is not available, as the messages were deleted and unrecoverable. K.M. testified as to the messages.

Muehlenthaler. Muehlenthaler gave K.M. the room number after he checked in, and they had sexual intercourse that night. K.M. identified that after Muehlenthaler undressed, she noted that he wears an insulin pump on his right buttock, something she could not see during the day while at school. Muehlenthaler is a diabetic.

Muehlenthaler and K.M. had sexual intercourse several more times over the course of the next few months, including at Muehlenthaler's house. Their last sexual encounter occurred in mid-July, by which time K.M. had graduated from high school. Muehlenthaler ended the relationship, informing K.M. that he would not be able to be with her anymore because his wife wanted to get pregnant. He gave her a sex toy as a break-up gift to "replace him." At all times during the sexual relationship, Muehlenthaler was employed as a teacher at North Polk. Several times during the relationship, Muehlenthaler told K.M. not to tell because he would lose his job, lose his wife, and get into trouble.

K.M. first reported the relationship in 2016 after she began college and saw a notice on social media that Muehlenthaler accepted a full-time position at a different school district. She reported the relationship to her college professor, who then made an anonymous third-party report to the principal of Muehlenthaler's new school. School officials from Muehlenthaler's new district received the anonymous report approximately two weeks after Muehlenthaler began working. The principal and superintendent met with Muehlenthaler the morning of August 30 to inquire about the anonymous report and asked Muehlenthaler if he had any information. Muehlenthaler informed the officials that the report must be about his high school helper and gave K.M.'s name. He informed the officials that he had become

uncomfortable with the dynamic between himself and K.M. after she shared personal information about herself and family. Muehlenthaler also indicated he reported the situation to officials at North Polk. After the meeting, Muehlenthaler returned to his classroom and taught for the remainder of the day. Ten minutes before the official end of that school day, Muehlenthaler was informed he was being placed on administrative leave pending the outcome of the school investigation. During a formal interview on September 15, Muehlenthaler refused to answer questions and was informed of his right to refuse to answer questions.

K.M. eventually spoke to the superintendent herself and ultimately to the police. She also turned over the sex toy Muehlenthaler gave her to the police. In March 2017, Muehlenthaler was charged by trial information with four counts of sexual exploitation by school employee, in violation of Iowa Code section 709.15(5)(a) (2013).[2] Prior to the trial in October, the State filed a motion in limine seeking to exclude any evidence of K.M.'s sexual history, which the court granted. During the hearing on the motion in limine, Muehlenthaler's counsel sought the exclusion of evidence of statements made by him to school officials during their investigation into the allegations of an inappropriate student relationship, arguing it would violate *Garrity*.[3] The court granted the request in part, determining that Muehlenthaler's statements made to school officials after he was informed he would be placed on administrative leave were to be excluded.

A jury found Muehlenthaler guilty as charged. Muehlenthaler filed post-trial motions in arrest of judgment and for a new trial. He argued there was

---

[2] Prior to trial, the State dismissed one count.
[3] *See generally Garrity v. New Jersey*, 385 U.S. 493 (1967).

impermissible burden shifting and claimed insufficiency of the evidence. Further, he argued the testimony of statements he made during a school investigation violated *Garrity*. The court denied both motions, finding there was sufficient evidence to establish the elements of the offenses, no shifting of the burden of proof, and no *Garrity* violation.

The court sentenced Muehlenthaler on each count to an indefinite term of incarceration not to exceed two years to run consecutively. His sentence also included an order to register as a sex offender, placement on the sex offender registry, and a ten-year special sentence pursuant to Iowa Code section 903B.2.

## II. Standard of Review

We review ineffective-assistance-of-counsel claims de novo. *State v. Harrison*, 914 N.W.2d 178, 188 (Iowa 2018). Muehlenthaler must show counsel "failed an essential duty and that the failure resulted in prejudice." *Id.* at 206 (quoting *State v. Schlitter*, 881 N.W.2d 380, 388 (Iowa 2016)). "[C]ounsel fails his or her essential duty by 'perform[ing] below the standard demanded of a reasonably competent attorney.'" *Id.* (quoting *Ledezma v. State*, 626 N.W.2d 134, 142 (Iowa 2001)). We presume "the attorney performed competently" and "we avoid second-guessing and hindsight." *Ledezma*, 626 N.W.2d at 142. Muehlenthaler must also demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 143 (quoting *Strickland v. Washington*, 466 U.S. 668, 964 (1984)).

**III.    Analysis**

A.      Ineffective Assistance of Counsel

Muehlenthaler makes several claims of ineffective assistance of counsel. We will address each in turn.

*1.      Opening Statement*

First, Muehlenthaler contends counsel was ineffective for failing to object and correct a prosecutor's statement after reading the trial information to the jury. A review of the record shows that before beginning its opening statement, the State read the trial information against Muehlenthaler to the jury.  After reading all of the offenses charged, the State then stated, "To these charges Mr. Muehlenthaler has entered a plea of guilty."  He contends that because his counsel failed to object or correct this misstatement, it prejudiced the jury and he did not receive a fair trial.

"[A] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial."  *United States v. Young*, 470 U.S. 1, 11 (1985).  "Inappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding."  *Id.*

First, after the jury was selected in this case, the court explained to the jury the sequence of events of the trial.  It instructed the jury that the attorneys would make opening statements but those statements were not evidence.  The court explained the State would read the trial information about the offenses charged and, again, instructed the jury that the trial information was not evidence.  The

State then gave its opening statement. Defense counsel followed with an opening statement that ended with him saying at the end of the evidence he would be asking the jury to deliberate and "find Kevin not guilty of each and every count."

After the close of the evidence, the court instructed the jury. Several jury instructions clearly identify that the jury is the decision-making body of Muehlenthaler's guilt or innocence on each charge, Muehlenthaler is presumed innocent, this presumption remained with him throughout the trial unless the evidence established guilt beyond a reasonable doubt, and, most importantly, Muehlenthaler pled not guilty to all charges. The instructions also reminded the jury of the court's earlier admonition that statements and comments by the attorneys were not evidence and their verdict must be based upon the evidence presented and the jury instructions.

However, on the record before us, we cannot determine why counsel did not object to the misstatement of his not guilty plea, and thus cannot determine whether counsel's performance fell below that of reasonably competent counsel. Likewise, the record is inadequate to decide the prejudice issue. Consequently, we preserve the claim for possible postconviction-relief proceedings.

*2. Defendant's past racial statements*

Muehlenthaler next contends trial counsel failed to object to testimony from K.M. that Muehlenthaler made racially insensitive comments to her about students at the school. Muehlenthaler claims the testimony was highly prejudicial and inadmissible character evidence which should have resulted in counsel moving for a mistrial.

A review of the record shows that during K.M.'s direct examination, after being asked about the nature of the jokes Muehlenthaler made while joking around with her, K.M. testified:

> And he also said some jokes that made me feel kind of uncomfortable, like when one of the kids who played trumpet, we were having a lesson, and he said that he was sad because his dad was moving back to Mexico, and then when he left the room he snickered and said that his dad was getting deported. And he also told me that when he was in college him and one of his friends would go to KFC and make fun of the black people, and generally just a lot of jokes that I thought were kind of really inappropriate and kind of immature.

Defense counsel did not object.

Iowa Rule of Evidence 5.404(b)(1) prohibits the admission of "[e]vidence of a crime, wrong, or other act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." To determine if evidence is admissible under rule 5.404(b), it must meet a three step analysis:

> (1) the evidence must be relevant and material to a legitimate issue in the case other than a general propensity to commit wrongful acts;
> (2) there must be clear proof the individual against whom the evidence is offered committed the bad act or crime; and
> (3) if the first two prongs are satisfied, the court must then decide if [the evidence's] probative value is substantially outweighed by the danger of unfair prejudice to the defendant.

*State v. Sullivan*, 679 N.W.2d 19, 25 (Iowa 2004).

Based upon our review of the record, we find it inadequate to address this claim on direct appeal. We preserve this claim to allow the parties to develop the record as to why defense counsel did not make a record on this issue and

"as to any prejudice which may or may not have resulted from trial counsel's actions." *State v. Shanahan*, 712 N.W.2d 121, 143 (Iowa 2006).

### 3. Failure to object to "backdoor" hearsay

Muehlenthaler also claims trial counsel was ineffective for failing to object to the State's questioning of several witnesses that amounted to "backdoor" hearsay. Further, he contends trial counsel failed to seek any curatives to the hearsay, either by requesting an admonishment or instruction to the jury to disregard the testimony, or by moving for a mistrial.

A "backdoor hearsay" problem occurs when a "question and answer [does] not produce hearsay 'in the classic or textbook sense,' [but] the questioning nevertheless [is] designed to circumvent the hearsay rule and present the jury with information from unsworn, out-of-court sources." *State v. Huser*, 894 N.W.2d 472, 497 (Iowa 2017) (quoting *Schaffer v. State*, 721 S.W.2d 594, 597 (Tex. App. 1986)). While "the form of [a] question [does] not literally require the jury to infer the subject matter . . . the use of the 'don't tell me what [the other person] said' questioning directly after [the witness] testified about the [communication] was designed to encourage the jury to make the connection." *Id.* "The state 'is not permitted by means of the insinuation or innuendo of incompetent and improper questions to plant in the minds of the jurors a prejudicial belief in the existence of evidence which is otherwise not admissible and thereby prevent the defendant from having a fair trial.'" *Id.* (quoting *State v. Carey*, 165 N.W.2d 27, 32 (Iowa 1969)).

During the trial, the State did not offer the testimony of Donna Spence or Mary Schmiltz, two school officials Muehlenthaler claimed to have spoken with

about his concerns regarding K.M.  The State did call Paula Wright, superintendent of the school district where Muehlenthaler began teaching in 2016.  During direct examination of Wright, the State elicited the following:

> [STATE]: And you stated that he informed you that she was acting weird.  Did he elaborate on that any further with you?
>
> [WRIGHT]: I asked him what "weird" meant, what that was, and he said that she was trying to get close to him, that she would share personal information with him that he was uncomfortable with.  I asked him if he told anyone about that, and he indicated he had spoken with his principal Donna Spence about it.
>
> [STATE]: And were you—did you look into what he claimed or who he claimed to have told these things to?
>
> [WRIGHT]: Not that day, but later, yes.
>
> [STATE]: Were you ever able to substantiate his claims that he had reported inappropriate behavior to anyone at North Polk?
>
> [WRIGHT]: When I spoke with Donna Spence on the phone she didn't indicate—
>
> [DEFENSE COUNSEL]: Objection, Your Honor.  Hearsay.
>
> THE COURT: The objection's sustained.
>
> [STATE]: That's okay.  Without saying what anyone told you, were you ever able to substantiate his claims?
>
> [WRIGHT]: No.
>
> [STATE]: And did the two of you speak about anything else at that time?
>
> [WRIGHT]: We continued with the conversation.  I asked him if anybody else knew, if he had talked to anybody else, and he indicated that he'd talked to Mary Schmiltz, and I'm sorry I probably pronounced her name wrong, she was his mentor teacher.  And I asked what was their advice, and he said to keep the door open and to keep things public, and to avoid the situation.
>
> [STATE]: And again, were you ever able to substantiate that claim he had reported to Ms. Schmiltz?
>
> [WRIGHT]: No.

The defense made no other hearsay objections to Wright's testimony and made no motions.

As to Wright's testimony about Donna Spence, the State's initial question of "Were you ever able to substantiate his claims" was asking for a yes or no answer.  However, the witness answered with more information than what was

asked. After the court sustained the hearsay objection, the State repeated its question but added in "[w]ithout saying what anyone told you." Whether this resulted in backdoor hearsay is a close question. Thus, any analysis of counsel's effective assistance on this issue requires further record. We preserve this issue for possible postconviction-relief proceedings.

Muehlenthaler also points to other testimony given by Wright which involved her conversation with K.M.:

> [STATE]: Okay. After you spoke with her, without saying what she said, did you try to verify details that you had received from [K.M.]?
> [WRIGHT]: After I spoke with her I did try to verify some details that she gave me.
> [STATE]: What did you try to verify?
> [WRIGHT]: His employment with Steve's Mobile Music.

Wright then proceeded to testify as to the steps of verifying his employment. This led the State to offer a printout of the webpage of Steve's Mobile Music, which included Muehlenthaler's email address at this job. As to this testimony, we find no prejudice, as K.M. had already testified about Muehlenthaler's employment at Steve's and his use of an email address through this employment.

Muehlenthaler also makes a claim of backdoor hearsay in the questioning of Daniel Mart. During his testimony, the State elicited the following: "Q. Yes, sir. To your knowledge, Dr. Mart, did the defendant ever make a report to the school about problems with [K.M.]? A. Not to my knowledge." We find his negative testimony was not backdoor hearsay. *See State v. Don*, 318 N.W.2d 801, 806 (Iowa 1982); *see also State v. Kern*, 307 N.W.2d 22, 26 (Iowa 1981).

#### 4. Bolster credibility of complainant

Muehlenthaler also argues his trial counsel was ineffective in failing to object to backdoor hearsay, which he contends was elicited to bolster K.M.'s credibility. He points to two witness exchanges with Wright and Detective Suzanne Owens, the lead investigator in the case. During the State's direct examination of Wright, the following testimony was offered:

> [STATE]: And without again saying what she told you, were you able to get more details about the situation that occurred?
> [WRIGHT]: Yes. I received quite a few details.
> [STATE]: Each of the three times that you spoke with [K.M.], was she consistent in her story and the details?
> [WRIGHT]: Yes.

During Detective Owen's direct examination, the following testimony was offered:

> [STATE]: Detective Owens, during the course of your investigation, how many opportunities did you have to speak with [K.M.]?
> [DETECTIVE OWENS]: I think I spoke to her several times. Most—after the first interview, most of them were just short phone calls.
> [STATE]: You indicated to us you also had the opportunity to review a statement she had typewritten; is that correct?
> [DETECTIVE OWENS]: Yes.
> [STATE]: Did you review any of the statements that she had provided to the school?
> [DETECTIVE OWENS]: Yes.
> [STATE]: During the course of your investigation, was [K.M.]'s statements consistent?
> [DETECTIVE OWENS]: Yes.

Counsel should be given an opportunity to respond. This issue is preserved for possible postconviction-relief proceedings.

#### 5. DNA evidence

Muehlenthaler also claims his counsel failed to object to expert testimony provided by a non-expert. He contends Detective Owens provided expert

testimony about the characteristics and destructibility of blood and DNA evidence when she was not an expert in the field of DNA or blood evidence. The State contends the detective's eighteen years of experience in law enforcement, including ten years as a detective, her work with DNA in many sexual abuse and assault investigations, and her training qualify her to testify about factors she considered in determining whether or not to attempt to collect evidence.

Detective Owens testified on direct examination by the State that in the course of her investigation of the allegations against Muehlenthaler, she did not believe she would find any DNA evidence in Muehlenthaler's house given the amount of time, two to three years, since K.M. alleged sexual acts between her and Muehlenthaler occurred in the house. She testified during the defense's cross-examination that she did not try to find any of Muehlenthaler's DNA on a sex toy provided by K.M. as an alleged gift from Muehlenthaler. She further testified that she received information in her investigation about K.M. bleeding on Muehlenthaler's couch while on her period but did not seek a search warrant to look for such evidence. Defense counsel asked:

> Knowing that there might possibly be blood DNA, which is not easily destroyed, did you when you got a search warrant for the Muehlenthalers' home have specialists come in from either your department or the DCI to at least look and see if there was any evidence to corroborate her story?

Detective Owens responded to this question with "no." On redirect, Detective Owens testified she worked specifically with DNA many times over her years in law enforcement and that it can be destroyed with the difficulty of destruction depending on the situation. The State then elicited testimony about different ways DNA could be destroyed, including cleaning products, the weather, and by touch.

Detective Owens then clarified her earlier testimony that it was possible DNA could have been found on the couch but she did not know whether she would find it if K.M. had wiped it up immediately. Further she testified that based upon her training and experience, wiping up DNA could destroy it.

Expert testimony is permitted if it consists of "scientific, technical, or other specialized knowledge [which] will help the trier of fact to understand the evidence or to determine a fact in issue." Iowa R. Civ. P. 5.702. "[K]nowledge, skill, experience, training, or education" may qualify a witness as an expert. *Id.* There is "no precise rule [that] governs how a witness may acquire the requisite qualifications." *State v. Belken*, 633 N.W.2d 786, 800 (Iowa 2001). The supreme court has adhered "to a liberal view on the admissibility of expert testimony." *Mensink v. Am. Grain*, 564 N.W.2d 376, 380 (Iowa 1997).

No DNA was actually tested in this case, and the State's case against Muehlenthaler did not rest on any DNA evidence implicating him. Further, Muehlenthaler's counsel's cross-examination of Detective Owens sought to undermine the police investigation and highlight that the detective failed to seek out all avenues of evidence as to multiple issues, including following up with questions about the couch, the sex toy, and even with the P.S. individual identified as the person who checked into the hotel. With regard to the DNA evidence, defense counsel accomplished this by getting Detective Owens to admit there could have been evidence on the couch K.M. described but she did not have it tested. The State was entitled to redirect examination of the detective to rehabilitate the witness. The State's examination was properly within the scope of the subject matter addressed by the defense cross-examination. To the extent her

testimony might be considered expert testimony, it was based on her training and experience and was limited in scope to respond to the defense's cross-examination. Her testimony was admissible but subject to challenge as to the weight to be accorded to the testimony. Counsel was not ineffective in failing to challenge expert testimony.

### 6. Violation of motion in limine

Muehlenthaler also contends the State violated its own motion in limine prohibiting both parties from asking K.M. about any other sexual partners. Before the trial started, the court ruled on a number of motions in limine. In the State's motion, it requested that any evidence regarding K.M.'s past sexual history or other sexual partners be prohibited. The court granted the State's motion "to the extent that unless we have a hearing outside the presence of the jury, the parties are prohibited from asking the alleged victim about other sexual partners and sexually transmitted diseases." During the defense's opening statement, defense counsel referred to P.S. and related to the jury that a person checked into a motel under that name on the night K.M. alleged she met and had sex with Muehlenthaler at the motel. He explained that P.S. was K.M.'s classmate. During both direct and cross-examination of K.M., the State and defense asked who P.S. was and how K.M. knew him. On re-cross, the State asked:

> [STATE]: [K.M.], you were asked a moment ago too about [P.S.]. [Defense Counsel] asked you about him being a track star and well known in the school. Was he really well known?
> [K.M.]: I—
> [DEFENSE COUNSEL]: I guess objection, Your Honor. Calls for speculation.
> THE COURT: It's overruled.

[K.M.]: I—I don't know. I—I remember his name and I remember what he looked like, but I wasn't friends with him, and I don't—I can't say how well known he was, I guess.

[STATE]: Did you ever meet him anywhere to go have sex with him?

[K.M.]: No.

[STATE]: Did you ever have sex with P.S.?

[K.M.]: Not that I remember.

We find the record is inadequate for us to resolve the claim on direct appeal and preserve this claim for possible postconviction-relief proceedings.

### 7. *Comments on the defendant's failure to testify*

Muehlenthaler also asserts the State made improper comments in its closing argument on his failure to testify or produce evidence during the trial. He contends the comments by the State implied he should have called witnesses to rebut the State's assertions and thus the comments amounted to a shifting of the burden of proof onto him. The record reflects that during closing argument, the State argued:

> So now we're going to go back to [K.M.] trusted him. She talked about all of these things. In a normal relationship, ladies and gentlemen, this teacher who didn't have a counselling certificate, who didn't have knowledge, who didn't have training, who was only part-time could have directed this young woman to a counselor, to a therapist, could have picked up the phone and called her parents. Did you hear of any of that happening? You didn't.

Muehlenthaler's counsel did not object.

It is the State who "bears the burden of proof in criminal cases." *State v. Hanes*, 790 N.W.2d 545, 556 (Iowa 2010). The State may not "attempt to shift the burden to the defense to call the witnesses or to suggest the jury could infer from the defense's failure to call the witnesses that they would not have said anything helpful to the defense." *Id.* at 557. Further, the "federal constitution prohibits a

prosecutor from commenting on a defendant's failure to testify in his or her own behalf." *State v. Bishop*, 387 N.W.2d 554, 562 (Iowa 1986). The State may not make either direct or indirect comments on a defendant's silence. *Id.*

To establish error, a "defendant must show (1) the prosecutor's conduct or remarks were improper, and (2) this misconduct prejudiced defendant's substantial rights causing the defendant to be deprived of a fair trial." *Id.* at 562–63. "To determine whether the [State]'s remarks were improper, we consider whether 'the prosecutor manifestly intended to refer to the defendant's silence, or [whether] the jury would "naturally and necessarily" interpret the statement to be a reference to the defendant's silence.'" *Id. at* 563 (quoting *State v. Hutchison*, 341 N.W.2d 33, 39 (Iowa 1983)). Further, "we will not find that the prosecutor manifestly intended to comment on defendant's right to remain silent when an equally plausible explanation exists for [the State's] comments." *Id.* However, "[a] prosecutor may properly comment upon the defendant's failure to present exculpatory evidence, so long as it is not phrased to call attention to the defendant's own failure to testify." *Id.* (quoting *United States v. Soulard*, 730 F.2d 1292, 1306 (9th Cir.1984)).

On our review, we find the State's statement advanced its arguments that Muehlenthaler did not report or direct K.M. to speak with anyone about the issues she shared regarding her family and self-esteem issues, which he claimed he had reported to school officials. We do not find the statements were improper as the remarks did not shift the burden of proof or refer to Muehlenthaler's decision not to testify. Therefore, counsel was not ineffective for not objecting.

B.      *Garrity* violation

Muehlenthaler finally claims the district court erred in allowing statements he made during a meeting with school officials on August 30, 2016, based upon a *Garrity* violation.  He argues the administration's investigation began on August 29, therefore any statements made during and after the August 30 meeting were inadmissible as he was not warned about the consequences of his answers and was not told he had a choice on whether or not to answer.  Because of the constitutional nature of this claim, our review is de novo.  *See State v. Neiderbach*, 837 N.W.2d 180, 190 (Iowa 2013).

During the hearing on the motion in limine, the defense moved to exclude all statements he made to school officials before he was given a *Garrity* warning on September 15.  The court initially determined that any conversations between Muehlenthaler and school administration after September 15 were inadmissible under *Garrity*.  However, after further discussion with counsel, the court clarified its ruling and held that the determining date for the admissibility of conversations between Muehlenthaler and school administration would be when Muehlenthaler was informed he was being placed on administrative leave.

During Wright's testimony, she testified she received a report during the evening of August 29 from the high school principal of an alleged inappropriate relationship Muehlenthaler had at his previous school.  She characterized the meeting as informal and she went into the meeting without much information as the allegation was anonymous. She testified that she set up the meeting with Muehlenthaler and the principal for August 30 during the second period of the school day in the principal's office.  She further testified that at the beginning of

this meeting, she informed Muehlenthaler of the allegation and asked if he knew anything about it. She identified that because the allegation was initially anonymous, it did not have much credibility at that point and so the meeting was about just finding out what Muehlenthaler might know about the situation. At that point, Muehlenthaler offered that it must have been "his high school helper" because she tried to "get close to him, and it was really weird situation, and he was uncomfortable with the situation." Muehlenthaler named the student helper and told the officials that he had reported the situation to two school officials. She testified to the follow-up questions she asked in response to Muehlenthaler's statements and that during their conversation, Muehlenthaler did not act surprised about the allegation and was not upset. At the end of the meeting, Muehlenthaler went back and taught his classes for the remainder of the day. At approximately 3:10 p.m., ten minutes before the end of the school day, Muehlenthaler was informed he was being placed on paid administrative leave and was sent home pending the outcome of the inquiry. Wright testified that she considered the investigation began on August 31, after K.M. called and the complaint was no longer anonymous.

The Fifth Amendment to the United States Constitution provides: "No person . . . shall be compelled in any criminal case to be a witness against himself." This amendment "applies to the State of Iowa through the Due Process Clause of the Fourteenth Amendment to the United States Constitution." *State v. Iowa Dist. Ct.*, 801 N.W.2d 513, 517 (Iowa 2011). As a general rule, compulsion is present when the State threatens to inflict "potent sanctions" unless the constitutional

privilege is waived or threatens to impose "substantial penalties" because a person elects to exercise that privilege. *Id.* at 518.

In *Garrity*, that threat was the loss of employment as police officers were investigated for allegedly fixing traffic tickets. 385 U.S. at 494. Before the officers were questioned, each was warned that anything they might say could be used against them in possible criminal proceedings and that they had the right to remain silent if their disclosure would tend to incriminate them, but if they refused to answer, they would be subject to removal from their jobs. *Id.* The officers subsequently answered questions without a grant of immunity and some of their responses to the investigator were used against them in subsequent criminal proceedings. *Id.* at 495. The Supreme Court noted:

> The choice given petitioners was either to forfeit their jobs or to incriminate themselves. The option to lose their means of livelihood or to pay the penalty of self-incrimination is the antithesis of free choice to speak out or to remain silent. That practice, like interrogation practices we reviewed in *Miranda v. State of Arizona*, is "likely to exert such pressure upon an individual as to disable him from making a free and rational choice." We think the statements were infected by the coercion inherent in this scheme of questioning and cannot be sustained as voluntary under our prior decisions
> . . . .
> We conclude that policemen, like teachers and lawyers, are not relegated to a watered-down version of constitutional rights. . . . We now hold the protection of the individual under the Fourteenth Amendment against coerced statements prohibits use in subsequent criminal proceedings of statements obtained under threat of removal from office.

*Id.* at 497–98, 500 (citations omitted). Penalties are "not restricted to fine or imprisonment." *Spevack v. Klein*, 385 U.S. 511, 515 (1967). "It means . . . the imposition of any sanction which makes assertion of the Fifth Amendment privilege 'costly.'" *Id.* (quoting *Griffin v. California*, 380 U.S. 609 (1965)). "The threat of [loss

of licensure] and the loss of professional standing, professional reputation, and of livelihood are powerful forms of compulsion to make a [teacher] relinquish the privilege." *Id.* at 516.

Here, the record does not suggest that Muehlenthaler spoke with school officials on August 30 based upon a belief that his employment was at risk unless he gave a statement. The meeting during which Wright inquired about the allegation was informal. Additionally, she testified that the allegation initially had little credibility since it was anonymous at that point and because she had little information, her initial inquiry was void of detail. Her subsequent questions to Muehlenthaler were based upon his voluntary responses. Further, after the meeting concluded, Muehlenthaler was allowed to return to teach the remainder of the day. School officials informed Muehlenthaler of his administrative leave near the end of the school day, not during or immediately following the morning meeting. We find no *Garrity* violation occurred as the "record before us contains no proof of threatened sanctions, direct or implied" during the August 30 meeting. *State v. Trigon, Inc.*, 657 N.W.2d 441, 446 (Iowa 2003).

## IV. Conclusion

We find two of Muehlenthaler's four claims were not impermissible backdoor hearsay therefore defense counsel was not ineffective for failing to object. We also find the State was entitled to redirect examination of a police detective on DNA evidence and the examination was properly within the scope of the defense's cross-examination. Further, to the extent her testimony might be considered expert testimony, it was based on her training and experience and was limited in scope, therefore defense counsel was not ineffective for failing to challenge expert

testimony.  We also find the State's statements did not shift the burden of proof to Muehlenthaler or refer to his decision not to testify, therefore his trial counsel was not ineffective for failing to object.  We preserve the remainder of Muehlenthaler's claims of ineffective assistance of counsel as we find the record inadequate to address the issues.  We find no *Garrity* violation.

**AFFIRMED.**